### PATRICK FITZSIMMONS *v.* WILLIAM JOSLIN.

The principal will be held *implicated to the fullest extent,* in what his agent does, within the scope of what he expected him to do, or for that which he knew he had done, if he persist in taking the benefit of the act.

A contract, induced by substantial fraud, without which it would not have been made, cannot be enforced against the party thus misled, whether the fraud originated with the other party, or his agent,—whether it were concerted by the principal, or adopted by him.

17

Fitzsimmons *v.* Joslin.

When one obtains credit upon the recommendation of some third party, whether written, or verbal, he must be held responsible for the extent of the recommendation, the same as if he had made it himself; and if it be false in material points, and this be known to the purchaser, the seller may, upon obtaining knowledge of such falsehood, rescind the sale and recover the goods, so long as they remain in the hands of the vendee, or are not passed from him upon any new and valuable consideration.

In this case the creditors of a trader, who was insolvent, but who wished to purchase goods, being unwilling to extend to him farther credit, told him, that they did not like to sell to him, if he could buy elsewhere, and gave him the name of another merchant, and authorized him to refer to them. He attempted to purchase of this merchant, and, being asked for references, gave the names of his original creditors, and was told to call again in half an hour. He did call again in the course of the day, and the purchase was effected. No inquiry was made by the vendor of the purchaser, as to his circumstances, nor did he give any assurances whatever relative thereto. On the same day, and after the purchase was effected, the purchaser met one of his original creditors, who told him, that he had been called upon by the vendor, and that "he had given as good an account of him as he could and not make himself liable,"—"that he had told him, that he, (the purchaser,) was a clever fellow, and was doing a thriving business in Vergennes, and that he (the creditor) had sold him goods, and he paid well, and he was ready to sell him more.'' At the time of this transaction the purchaser was in arrears to these same original creditors, to the amount of several hundred dollars each, and their demands had actually been placed in the hands of their attorney at Vergennes, where the purchaser resided, for collection; and, as soon as they learned, that this last purchase had been effected, they sent instructions to the attorney to attach the goods, as the property of the purchaser, upon their arrival at the place of destination. This was done; and, as soon as the vendor was informed of the insolvency of the purchaser, which was within a week after the attachment, he demanded the goods of the sheriff, offering to pay freight; but the sheriff refused to surrender them. The attachment was made upon suits in favor of the several original creditors; and it did not appear, that either of these creditors, except the one above mentioned, had made any representation whatever in relation to the matter. And it was held, that the purchaser was responsible for the representations made by his creditor, and that the vendor, having been cheated and deceived by means for which the purchaser was legally responsible, might sustain trover against the sheriff to recover the value of the goods so attached.

TROVER, to recover the value of goods sold by the plaintiff to one Jonathan S. Preston on the first day of July, 1844. Plea, the general issue, and trial by the jury, December Term, 1845,—BENNETT, J., presiding.

On the trial the plaintiff introduced Preston as a witness, whose testimony tended to prove, that in June, 1844, while he was residing and doing business as a trader at Vergennes, he went south, for the purpose of purchasing goods; that while he was at Troy, on his way to New York, he called upon Wooster & Russell and Bates & Sage, who had been merchants there, and to each of which firms he was indebted in about the sum of $500, and told them, that he was not then prepared to pay any part of their claims against him, but that he wished to purchase more goods, and thought of going to New York for that purpose, and wanted to know, whether they were going to trouble him, if he did so, and said, that if they were, he would not buy; that they told him, that they had no intention of troubling him, and had no objection to his purchasing goods elsewhere, if he chose, and that he must pay them as soon as he could, and that they would receive from him small sums, from $10,00 to $50,00, in payment, from time to time, as he could spare the money; that in a conversation with Russell, of the firm of Wooster & Russell, he told the witness, that he had better buy more domestic goods, as they would sell well, where he was doing business; that the witness went to New York, and, upon his return to Troy, again called upon both Wooster & Russell and Bates & Sage, and told them he had purchased his dry goods in New York, but had not obtained his groceries; that Sage then told him, that his business was considerably extended, and that he had better buy his groceries of some one else,—but that, if he could not buy elsewhere, he would sell to him; that, upon the witness inquiring in relation to the grocery merchants, Sage gave him the names of three in Troy, and among them that of the plaintiff; that Wooster told the witness,  that he could refer to him; that afterwards, on the first day of July, 1844, the witness applied to the plaintiff, in Troy, to purchase of him a bill of groceries on credit; that the plaintiff inquired for references, and the witness gave him the names of Wooster & Russell and Bates & Sage, and the plaintiff told him to call in the course of half an hour, and he would give him an answer; that he did call again in the course of the day, and the plaintiff sold to him the goods in question on credit; that the plaintiff made no inquiries of the witness as to his pecuniary circumstances, and the witness made no representation to him; that on the same day the witness saw

Wooster, who inquired of him, whether he had purchased his groceries, and the witness told him, that he had purchased them of the plaintiff; that Wooster then told the witness, that the plaintiff had called upon him, and that he "had given as good an account of him, (Preston,) as he could without making himself liable,"—that "he told him said Preston was a clever fellow, and was doing a good and thriving business in Vergennes, and that he had sold him goods, and he had paid well, and he was ready to sell him more."

The plaintiff also introduced evidence tending to prove, that the goods in question were directed to Preston at Vergennes, Vt., and were forwarded by the plaintiff, by the Vergennes and Troy line of boats, to Preston, on the third day of July, 1844, and that the boat, by which the goods were forwarded, arrived at the wharf at Vergennes, with the goods on board, on the morning of the sixth of July, 1844.

The plaintiff also introduced evidence tending to prove, that, some months previous to the first of July, 1844, Bates & Sage placed their demand against Preston in the hands of their attorneys in Vergennes, stating to them, that, as they were not well acquainted with Preston's circumstances, if any thing should take place, calculated to affect unfavorably his responsibility, they wished their debt secured; that Wooster & Russell, soon after Preston had purchased of the plaintiffs the goods above mentioned, sent their demand against Preston to their attorneys in Vergennes, with instructions to attach such goods of Preston, as should arrive in said boats; and that on the fourth day of July, 1844, the attorneys caused writs to be issued upon both of said demands, and, on the morning of the sixth of July, 1844, caused the same to be served by the defendant, as deputy sheriff, by attaching, among other property, all the goods which Preston had purchased of the plaintiff, as above mentioned,— being the same goods described in the plaintiff's declaration in this suit.

The plaintiff also introduced evidence tending to prove, that Preston, at the time of purchasing the goods of the plaintiff, was insolvent, and was so at the time of trial; that he had never paid the plaintiff for the goods; and that the plaintiff, on learning the insolvency of Preston, came to Vergennes, and, on the thirteenth day of July, 1844, demanded of the defendant the goods in question,

and offered to pay to him the freight thereon,—but that the defendant refused to surrender them.*

The defendant introduced evidence tending to prove, that Preston had at first represented himself to both Wooster & Russell and Bates & Sage as perfectly able to pay his debts, and as being worth from $1000 to $1500 after his debts were paid, and that he had not at any time represented to them the contrary, but that, in 1843, he told them, that, by reason of sickness in his family, he had not been doing as well as he had been previously and had been obliged to increase the mortgage on his place. The defendant also proved, that, some time previous to June, 1844, Wooster & Russell had dissolved their copartnership, and Wooster was doing business alone, and also that Bates & Sage had dissolved their copartnership and Sage was doing business alone.

The plaintiff requested the court to charge the jury, that, if they should find, that there was fraud in either Preston, or Wooster & Russell, or Bates and Sage, in obtaining the goods from the plaintiff, the contract of sale was void, and the plaintiff might retake the goods from the possession of Preston, or of the defendant, after the attachment; and that, if Preston, without disclosing his circumstances to the plaintiff, purchased the goods while he was a bankrupt, or on the eve of bankruptcy, and this not known to the plaintiff, this would be such a fraud, as would render the sale void and give the plaintiff the right to retake the goods from the defendant, or Preston.— *G/L*

But the court instructed the jury, that, if they found, that Wooster & Russell, or Bates & Sage, or either one of them, had made false representations to the plaintiff in regard to the solvency of Preston and of his being worthy of credit, and which they knew at the time to be false, and which were material and induced the plaintiff to give the credit to Preston, such persons might be liable to an

---

* The plaintiff also claimed, that the goods, at the time he demanded them of the defendant, were still *in transitu,* and that therefore he had a right to reclaim them, and he introduced much testimony upon this point; but the facts, in this respect, were the same with those proved in the case of *Sawyer* v. *Joslin,* 20 Vt. 172; and the decision of that case rendered it unnecessary to argue or decide the point, in the supreme court, in this case.

action for deceit, brought by the plaintiff against them,—but that this would not render the sale to Preston void, provided he acted honestly in making the purchase, and was guilty of no fraud on his part, and was in no way privy to or cognizant of any fraud, committed by Wooster & Russell, or Bates & Sage, or either of them,— but that, if Preston was a partaker in the fraud, it would avoid the sale and enable the plaintiff to recover in this action. And the court declined to charge, that the mere suppression, by Preston, of the fact, that he was a bankrupt, or on the eve of bankrupcy, would constitute such a fraud, as would vitiate the sale.

Verdict for defendant. Exceptions by plaintiff.

*F. E. Woodbridge* and *A. Peck* for plaintiff.

1. The purchase of the goods by Preston, while a bankrupt, without disclosing his condition, was such a fraud, as vitiated the sale, and the vendor had a right to retake the goods. In a sale on credit the solvency of the vendee is the sole inducement to the sale, and the very essence of the contract. The asking for credit, by Preston, was equivalent to a representation, that he was worthy of it. *Bruce* v. *Ruler,* 2 M. & R. 3, [17 E. C. L. 290.] *Root* v. *French,* 13 Wend. 570. *Polhill* v. *Walter,* 3 B. & Ad. 114, [23 E. C. L. 38.] *Hill* v. *Gray,* 1 Stark. R. 434, [2 E. C. L. 459.]

2. The sale was void, by reason of the false representations made by Wooster to the plaintiff relative to Preston's solvency. These representations preceded the sale, and were known to be false, both by Preston and Wooster; and, as the plaintiff declined to give the credit, until informed as to Preston's solvency, and then gave the credit upon false representations made by the person to whom Preston referred him, Preston, so far as relates to the validity of the sale, is bound by such representations. The reason, why the declarations of an agent are not ordinarily evidence, is, that the agent is not such, for the purpose of making declarations as a medium of proof; but in this case Preston, by referring to Wooster for information, thereby made him his agent for that purpose, and he is bound by his representations;—the representations were the *res gestæ.* Chit. on Cont. 406. *Hill* v. *Perrott,* 3 Taunt. 274. *Abbott et al.* v. *Barry,* 2 B. & B. 369, [6 E. C. L. 157.] *Stewart* v. *Austin,* 1 Met. 198. *Naylor* v. *Dennie,* 8 Pick. 198. *Irving* v. *Motley*

Fitzsimmons *v.* Joslin.

*et al.*, 20 E. C. L. 233. *Root* v. *French*, 13 Wend. 570. *Mowry* v. *Walsh*, 8 Cow. 238. 1 Sw. Dig. 763. 1 Phil. Ev. 101. *Burt* v. *Palmer*, 5 Esp. R. 145. *Harrison* v. *Vallance*, 8 E. C. L. 239. *Abbott et al.* v. *Barry*, 6 E. C. L. 157. Preston, by accepting the goods, knowing the sale to have been made upon representations known by himself and Wooster to be false, adopted the contract, and thereby assented to and adopted the fraud, which induced the sale. Ld. ABINGER, in *Cornfoote* v. *Fowke*, 6 M. & W. 358,—adopted in *Wilson* v. *Fuller*, 43 E. C. L. 629. *Mayhew* v. *Eames*, 10 E. C. L. 195. And it was a fraud in him, in not countermanding the order, when he was informed of the representations made by Wooster. *Hill* v. *Gray*, 2 E. C. L. 459. *Langridge* v. *Levy*, 2 M. & W. 531. *Levy* v. *Langridge*, 4 M. & W. 336. *Pilmore* v. *Hood*, 35 E. C. L. 43. Chit. on Cont. 680. *Polhill* v. *Walter*, 23 E. C. L. 38.

*Linsley & Beckwith* and *J. Pierpoint* for defendant.

1. The verdict, under the charge, repels every presumption of fraud on the part of Preston, or of knowledge of any fraud in others. If, then, Preston's conduct in the purchase were honest, the sale is valid, though others, without his knowledge, falsely represented his circumstances.

2. Wooster & Russell were in no sense agents of Preston. They were inquired of, because they were not agents,—not because Preston had confidence in them, but because the plaintiff had. An agent is one, who acts under authority and by direction of his principal; and a special agent is limited by his instructions. There is no analogy between an agent, appointed and acting by the authority of his principal, and one who is referred to, as knowing a man's credit. The person referred to does not consider himself as acting for another. The person making the inquiry does it on his confidence in the character of the person to whom he applies. There is no case, from *Pasley* v. *Freeman* to the present time, where it has been claimed, or intimated, that the fraudulent representations of the person referred to, without the knowledge of the principal, would avoid the contract. The want of precedent should be conclusive against the claim of the plaintiff. *Wilson* v. *Fuller*, 43 E. C. L. 635. *Cornfoote* v. *Fowke*, 6 M. & W. 358.

3. By the statute of this state it has been said, virtually, that the doctrine of *Pasley* v. *Freeman* tends to perjury, and that, except the representation be in writing, no action shall be brought. From this it would seem, that the court should not proceed beyond precedent, to withdraw contracts from the effect of that statute, as it is against the clear policy of our law.

The opinion of the court was delivered by

REDFIELD, J. The general importance of this case to the commercial portion of the community will perhaps justify a more extended statement of the facts involved in it, than would otherwise be required.

The plaintiff is a merchant in the city of Troy, and sold the goods in controversy to one Jonathan S. Preston, of the city of Vergennes, upon whose debts the defendant, a sheriff's deputy, claims to hold them by virtue of attachments in favor of Wooster & Russell and Bates & Sage, two mercantile firms lately doing business in Troy. In the month of June, 1844, Preston, who had for some years been doing business in Vergennes, as a merchant, went south for the purpose of purchasing goods. On his way to New York he called upon Wooster & Russell and Bates & Sage, in Troy, to each of which firms he was indebted to the amount of about five hundred dollars, and told them he could not then pay them any part of what he owed them, but that he wished to purchase more goods, and thought of going to New York for that purpose, and wished to know if they were going to trouble him if he did so, and said, if they were, he would not buy. They gave him every assurance, that they had no such intention ; said they had no objection to his purchasing goods elsewhere ; and that he must pay them as soon as he could, and they would receive of him small sums, from ten to fifty dollars, as he could spare the money.

Preston made the purchase of his dry goods in New York, and returned to Troy to purchase his groceries. Bates & Sage told him, they did not like to sell him such goods, if he could get them elsewhere ; if he could not, they would sell him. Upon Preston's inquiring for grocery merchants, they gave him the names of the plaintiff and of two others in that trade. In conversation between Wooster and Preston, about the same time, Wooster told him *he*

*could refer to him.* Immediately afterwards, and on the first of July, 1844, Preston applied to the plaintiff to sell him a bill of groceries upon credit. The plaintiff inquired for references, and Preston gave him the names of Wooster & Russell and Bates & Sage, and the plaintiff told him to call in the course of half an hour and he would give him an answer. He did call, and the plaintiff sold him the goods in controversy. The plaintiff made no inquiries, and Preston gave no assurances, or representations, as to his pecuniary circumstances. The same day Preston saw Wooster, who inquired if he had made the purchase, and, upon being answered in the affirmative, Wooster told Preston, that the plaintiff had called upon him *and he had given as good an account of him as he could, and not make himself liable ;—said he told him Preston was a clever fellow, and was doing a thriving business in Vergennes, and that he had sold him goods, and he paid well, and he was ready to sell him more.*

It appeared in the case, that, when Preston first began to trade with Wooster & Russell and Bates & Sage, he represented to them, that he was perfectly able to pay his debts, and was worth from one thousand to fifteen hundred dollars above his debts, and that he had never stated the contrary to them ; but that in 1843 he told them, that, in consequence of sickness in his family, he had not been doing as well as formerly and had been obliged to increase the mortgage on his place. It also appeared, that, at the time of making the purchase of the plaintiff, Preston was insolvent, and that he had never paid for the goods. The goods were shipped for Vergennes on the third of July, and arrived on the sixth. Some months before, Bates & Sage had sent their demand to an attorney in Vergennes, for him to watch Preston and secure them, if necessary. Immediately after the purchase by Preston, Wooster & Russell sent their demand to an attorney there, with instructions to attach these goods, when they arrived,—which the defendant did, as soon as they were laid upon the wharf, upon the debts of Wooster & Russell and Bates & Sage. As soon as the plaintiff learned these facts, he went to Vergennes and demanded the goods of the defendant, on the seventeenth day of July, and offered to pay the freight; but the defendant declined surrendering them. Whereupon the plaintiff brought this action of trover.

This is certainly a somewhat uncommon case; and such as, for

18

the credit of the mercantile profession, one would hope might not soon become common.  As a question of moral justice, it could admit of no doubt whatever.  That, of itself, would not be conclusive upon the legal rights involved ; but it is, perhaps, some guide as to what ought to be the result, at which the court should aim, at which they should strive to come, if it can be compassed without too much outrage upon the settled principles of the law.  It has been often said, that the rules of the law, when wisely administered, are always consistent with the relations of moral justice and absolute equity. It may be safely said, that it must argue some great deficiency somewhere, when that is not the case.  But viewed simply in that light, it is but an insult to our common sense of justice, to ask whose right to these goods is superior, that of the plaintiff, or that of Wooster & Russell ?  In moral justice, the claim of Wooster & Russell to these goods, as against the plaintiff, is no better than that of a mere trespasser, or, indeed, of one who obtains goods by false pretences, and who is consequently liable to public prosecution and infamous punishment, in most of the states.  And, as between the plaintiff and Preston, where the mere question of title undoubtedly rests, there seems to be no reasonable ground of doubt, that the plaintiff's claim, *in foro conscientiæ*, is superior.  If we admit for the moment, that Preston is wholly guiltless of any moral wrong,—which it is certainly difficult to believe,—so also is the plaintiff.  In this view, the plaintiff has been led into an innocent mistake, without fault on his part, and under that mistake entered into the contract of sale. If he had known all the facts, which Preston knew, and which Preston supposed he believed he knew, but at the same time also knew that he did not correctly understand, he would never have delivered the goods.  Can it be said, then, that, when one party acts under a misconception of the facts, most material to the contract, which are known to the other party and studiously kept back, knowing that the other side is acting under this delusion,—can it be said, that such contract is binding at the bar of conscience, or, indeed, in moral or legal justice ?  I trust not.

But may it not, with fairness, be argued, that Preston was not wholly innocent, notwithstanding the jury did not find him guilty of any concert with Wooster & Russell and Bates & Sage, to obtain the goods for their benefit ?  He must have known himself to be

somewhat unworthy of credit, and that Wooster so considered him, as also Bates & Sage, as they all virtually declined giving to him any farther credit. He must have known, too, that the plaintiff would never trust him, unless he was recommended, as being better than he in fact was. He must also, as a reasonable man, have known, that, if Wooster told the plaintiff the simple truth, the plaintiff would no more trust him, than he would put his goods in the fire. When, then, he found the plaintiff willing to trust him, he must have known, and did know, that something more than the truth, or something different from the truth, had been told him,—in short, that he was deceived, and that, if he parted with his goods, he did it under a delusion as to the facts. Is it true, then, that Preston is any less guilty of fraud, than if he had himself made the false impression ? Is it of any importance to the legal quality of Preston's acts, that there was no common motive operating upon himself and those to whom he made reference ? The plaintiff is as truly deceived and defrauded, as if there had been a pre-concert between Preston and his other creditors, to whom he referred. He must, in every view, be implicated to the fullest extent in what his agent did, within the scope of what he expected him to do, or within that which he knew he had done, if he still persisted in taking the benefit of the act. These are but elementary principles in the law of agency, familiar to all in the profession, and almost innate in the breast of all men not wholly insensible to all just moral relations.

But in coming to the examination of the decided cases upon this subject, if we attempt to digest and reconcile them, there is perhaps more difficulty. The case of *Langridge v. Levy, et vice versa,—* 2 M. & W. 519 ; 4 Ib. 336,—and the case of *Cornfoote* v. *Fowke,* —6 M. & W. 358,—seem to me wholly irreconcilable, so far as any general principle is attempted to be evolved from them. And, in my humble judgment, I feel compelled to declare, that both of those cases seem to be wholly at variance with the general current of the authorities upon that subject, since the case of *Pasley* v. *Freeman,* 3 T. R. 51. The principle there declared, and sustained by the majority of the judges with great learning and clearness, and which has formed the basis of all the subsequent determinations upon the subject, is, that " a false affirmation, made by the defendant with intent to defraud the plaintiff, whereby the plaintiff receives damage,

is the ground of an action ;"—" It is not necessary, that the defend-
ant should be benefited by the deceit, or that he should collude with
the person who is." It is true, that Lord ELDON, in *Evans* v. *Bick-
nell,* 6 Ves. 186, enters into a somewhat extended discussion of the
case of *Pasley* v. *Freeman,* in order to show its dangerous charac-
ter, in practice. And, so far as I know, we here get the first hint
of the necessity of extending to this subject the doctrine of the
statute of frauds, which has been adopted in England,—6 Geo. 4,
ch. 14 ; commonly called Lord Tenterden's Act,—and in many of
the American states. The case of *Pasley* v. *Freeman* has never-
theless been followed, when not controlled by positive statutes, ex-
cept as particular cases may, under peculiar circumstances, slightly
have deviated from the path there marked out. But the cases above
cited from Meeson & Welsby seem to me wholly at variance with
the doctrine laid down in *Pasley* v. *Freeman.* The case of *Lang-
ridge* v. *Levy* is so peculiar, that it could hardly be esteemed of
much importance to give it an extended examination. The striking
peculiarity of the case seems to be, that there is no privity whatever
between the parties to the action. If one is to be held, in a court
of law, absolutely liable to every body, for all the remote conse-
quences of his acts and declarations, provided, only, that they may
be supposed to be somewhat within the range of his probable con-
templation at the time they occur, the labors of courts must, in this
class of injuries, be very greatly extended. We shall soon have to
entertain actions for fraud, not only in favor of the party primarily
injured, but also in favor of all his creditors, for the reason that his
ability to pay was thereby lessened. We recollect such an action
once being brought in a neighboring county, which excited so much
levity about the bar, that it was with difficulty the court could put
on a degree of gravity sufficient to hear the opening argument for
the plaintiff,—which closed the discussion, the case being really too
ludicrous to be seriously entertained. But if the case of *Langridge*
v. *Levy* is sound law, the counsel in that case, instead of being
laughed out of court, should have been commended for his wisdom
and sagacity.

The case of *Cornfoote* v. *Fowke* is certainly a most remarkable
instance of self delusion, brought about by the severity of one's own
discriminations. Lord ABINGER, who dissented from the opinion

Fitzsimmons *v.* Joslin.

of the majority of the judges, seems to have readily comprehended the delusion, under which his brethren were laboring, as indeed he always did all intricacies of thought or language. But when the majority of a court of law gravely tell us, that, in a case where the defendant has been most grossly deceived and cheated by the false representations of the plaintiff's agent, which the plaintiff himself knew to be false, but did not expect the agent would make, but which became essential, to induce the defendant to make the contract, and were consequently made by the agent at a venture, and the plaintiff, after knowing the facts, still persists in enforcing the contract, it should be said the defendant is liable, because there is no fraud on the part of the plaintiff,—none on his own part, because *he made no representations,* and none on the part of the agent, because *he did not know them to false,*—it is certainly not a little calculated to shake our reliance upon human judgment and discrimination. One is almost compelled to doubt, if indeed these men can be serious. It almost strikes the mind as matter of mere *badinage.* It is scarcely surpassed, in its ethical or metaphysical acumen, by the sophistry of the ancient schoolmen, by which it was attempted to be proved, by syllogistic reasoning, that, in a foot race, Hercules could never overtake the lobster. This whole subject is placed in the clearest possible light by Lord DENMAN, in *Wilson* v. *Fuller,* 43 E. C. L. 634, in these lines,—" *We think the principal and his agent are, for this purpose, completely identified; and that the question is, not what was passing in the mind of either, but whether the purchaser was in fact deceived by them, or either of them.*" That rule, applied to the case of *Cornfoote* v. *Fowke,* would have led to the same sensible conclusion, to which Lord ABINGER came,—" *That, whether there was moral fraud, or not, if the purchaser was actually deceived in his bargain, the law will relieve him from it.*" It is true, that the case of *Wilson* v. *Fuller,* where the court of king's bench adopt the reasoning of Lord Abinger in *Cornfoote* v. *Fowke,* was itself reversed in the exchequer chamber,—but merely upon the ground, that in that case the purchaser did not rely upon the representations of the agent, but upon his own knowledge of the subject and the general custom of the place. It is therefore, I think, impossible to say, that the case of *Cornfoote* v. *Fowke* has been followed, or to believe, that it can be generally

adopted, by the courts of common law, either in England or this country. The cases must revert and can only find secure repose upon the old basis, that a contract, superinduced by substantial fraud, entering into the very basis and framework of the contract, and without which it would not have been made, cannot be enforced against the party thus misled, whether the fraud originated with the other party, or his agent,—whether it were concerted by the principal, or adopted by him. If, indeed, as was held in the exchequer chamber, in *Wilson* v. *Fuller*, 43 E. C. L. 634, a party fall into a delusion for want of proper examination, and by a rash confidence in his own knowledge or sagacity, the law will not relieve him from his contract.

And many of the cases have gone even farther than this, in making parties liable for the consequences of false representations, made by them in good faith, but without proper examination. In *Clark* v. *Foster*, 8 Vt. 98, which was an action on the case for a fraudulent imposition upon the plaintiff, by the defendant, in representing himself as the agent of another, and as having authority to convey real estate, when in fact he had no such power, although he supposed he had, it was held, that there was no necessity for showing moral fraud in the defendant; that he must see to it, that he had such authority, as he represented himself to have; that it argued some wrong on his part, to assume to do the act, when he did not know that he had sufficient authority, although he supposed he had such authority; and that, where one of two persons, innocent of any intentional wrong, must suffer, it was reasonable the loss should fall upon him, who was most in fault. The same was substantially held in the case of *Evans* v. *Collins*, reported in a note to *Wilson* v. *Fuller*, 43 E. C. L. 639. The action was case for a false representation, whereby the sheriffs of London were induced to detain the wrong person under process. The plaintiff had a verdict upon two issues; and the defendants moved to enter a verdict for them on one issue, because it was not proved, although alleged, *that the defendants knew the statement to be false.* Lord DENMAN said, "One of two persons has suffered by the conduct of the other. The sufferer is wholly free from blame, but the party, who caused his loss, though charged neither with fraud, nor with negligence, must have been guilty of some fault, when he made a false representation. He

was not bound to make any statement, nor justified in making any, which he did not know to be true; and it is just, that he, not the party he has misled, should abide the consequences of his miscon- duct." The declaration was held sufficient without the *scienter* in this case.

So, too, it is not always necessary, that there should be an express representation; one will often be inferred from circumstances, which are in fact equivalent to such positive representation,—as in *Bruce* v. *Ruler*, 17 E. C. L. 290, where the defendant induced the plain- tiff to accept an insolvent tenant in his stead, without making known such insolvency. The defendant made no positive representation, whatever, as to the person he offered as tenant. The court held, that the mere fact of offering him as such, to take his own place, was equivalent to a representation of his solvency, and, as he knew the contrary, he was guilty of a fraud. BAILEY, J., says, "I thought at the trial, that keeping back that fact was, legally speaking, a fraud, which rendered the defendant liable." Lord TENTERDEN says, "I think so now." BAYLEY, J., "It is very desirable, if pos- sible, to *make* people honest." HOLROYD, J., "I think it was clearly a fraud." So, too, in *Hill* v. *Gray*, 2 E. C. L. 459, it was held, that suffering one to buy goods, under a wrong impression as to their quality in an essential particular, is a fraud, although the seller did nothing to induce the misapprehension; and that the pur- chaser is not bound by the contract. The only misapprehension, in this case, was in regard to the picture, which was the subject of the contract, having belonged to the cabinet of Sir Felix Agar. It was sold and bought as one of Claude's, and was confessedly gen- uine; but the sale was held void, because the purchaser was allowed to buy it, supposing it had belonged to that particular cabinet, which in his estimation greatly enhanced its value, and which the seller knew to be false. Lord ELLENBOROUGH said, "Although it was the finest picture *Claude* ever painted, it must not be sold under a de- ception."

Some of these cases carry the doctrine of legal fraud beyond the general scope of the cases upon that subject, and somewhat, per- haps, beyond that of *Pasley* v. *Freeman*, in terms certainly, if not in principle; but, with the exception of *Langridge* v. *Levy*, they do not go beyond the just and safe limit of requiring uprightness

and fair dealing, both in the suggestion of falsehood and the suppression of truth.

And in regard to representations made by others, without authority at the time, the person who takes advantage of the influence of such false representations, to obtain an unjust contract, or who adopts a contract, made for his benefit through the instrumentality of such representations, becomes himself a principal in the fraud, and it is the same as if he made the representation himself. *Pilmore* v. *Hood*, 35 E. C. L. 43. This was the case of one in treaty for the sale of a public house, and who represented to one Browmer, that the monthly receipts amounted to a given sum. This, at the time, the defendant knew to be false. Browmer, failing to complete the contract himself, procured the plaintiff to come and take it, and had repeated this false representation to him; and this was known to the defendant at the time he closed the contract with the plaintiff, although he himself made no representation whatever to the plaintiff and gave Browmer no authority to make any on his behalf. Some of the judges in the common pleas, in deciding this case, seem to suppose it to be like that of *Langridge* v. *Levy*. But to me it seems nothing more than the common case of one being liable for the acts of his agent, whether he gives express authority, or *adopts them subsequently*. It is but perpetrating a fraud for one's own benefit, *through the instrumentality of an innocent and volunteer agent*. And if the doctrine of *Cornfoote* v. *Fowke* is to be regarded as sound, this case is undoubtedly overruled.

But to apply these principles to the present case;—if both firms, to whom Preston referred, and on whose behalf the defendant claims to hold the goods, were to be regarded by the court as equally implicated in the. " gross, rank fraud," by which the goods were obtained, to use the words of Lord KENYON in *Willis* v. *Martin*, 4 T. R. 68, then we should have no doubt, that they would be estopped from setting up their own fraud in defence of the action,—as was held in *Hill* v. *Parrott*, 3 Taunt. 274, and *Biddle* v. *Levy*, 2 E. C. L. 277. But here it is not shown, that Bates & Sage made any representation whatever. The case must therefore rest upon Preston's title. And here it seems to us, the case is equally free from doubt. If goods are obtained by means of a gross fraud, it seems of small import, whether the purchaser participated in the fraud to

Fitzsimmons *v.* Joslin.

the full extent. The question is, has the seller been cheated and deceived, by means for which the purchaser is legally responsible ?

We do not intend to say, that, in a case like the present, the purchaser is bound, whether interrogated or not, to disclose his true circumstances as to property. That will depend upon the nature of each case, somewhat, no doubt. If one is *wholly and notoriously desperate* in regard to pecuniary responsibility, it could not be said, that he would be *legally justified* in suffering himself to pass for a man of substance, although he himself had been in no way instrumental in bringing about the delusion,—if such a case could be supposed as likely soon to occur. Within the range of cases of questionable responsibility, no doubt the person seeking credit is justified in obtaining it by mere silence, or by fair promises,—since these are, in some sense, the staple of commercial enterprise and prosperity. But, beyond this, we do not see how any one can be justified, even in the suppression of truth, much less in the suggestion of falsehood, whether by himself, or by others on his behalf.

But we think, in the present case, Preston was guilty of something more than mere silence. We think he is responsible for the representation made by Wooster. He had told Wooster, that his circumstances were getting worse, that he could not pay him ; and he knew that Wooster did not intend to trust him farther; and still that he was willing to recommend him to the plaintiff, *as being worthy to be trusted.* He must have known, then, that Wooster intended to say something on his behalf, which would have a tendency to gain him credit. And, knowing that the truth could have no such effect, he must have known, that he would, in order to effect his object, be compelled to assert falsehood, and that he was prepared to do it, and, if applied to, would do it. In sending one to Wooster, under this state of facts, he is no doubt far more culpable in a moral point of view, than to have made the representation himself, and precisely as much so in law. His conduct, too, when informed by Wooster what he had told the plaintiff, shows very clearly, that Wooster had only done what he expected and desired. This view of the case was excluded from the jury by their being required to find, in order to find for the plaintiff, that Preston was partaker of Wooster's fraud, that is, the same fraud and the same purpose.

But aside from all evidence of actual previous knowledge, that the

representations of Wooster in relation to the credit of Preston were to be and must of necessity be false, in order to answer in any sense the end contemplated, we think, that, as a general rule, it is safe to say, that one who obtains credit upon the recommendation of some third party, whether written or verbal, must himself be held responsible for the extent of that recommendation, the same as if he made it himself; and if it be false in material points, and this be known to the purchaser, the seller may, upon obtaining knowledge of such falsehood, rescind the sale and recover the goods, so long as they remain in the hands of the vendee, or not passed from him upon any new and valuable consideration. This is but simple justice, even if we consider the parties equally innocent. But enough has been said, to show that Preston is to be considered as legally liable for the consequences of Wooster's representation. If one refer to another, upon any subject, it is a general rule of evidence, thta he is bound by what that person says upon the subject, the same as if he had said it himself. But it has been said in the argument of this case, that referring to another for a character, or credit, does not come within the rule. But I confess, it does not so strike my mind. A merchant, or professional man, who refers to another for a character, or credit, is understood to refer to *his own friend,* not the friend of the person seeking information. It often happens, that the person referred to is the mutual friend of both parties; but he is selected by the person wishing for credit, he is supposed to speak on his behalf, for his benefit, and the person giving the reference is understood, in naming him, to vouch for his ability to give correct information, and for his being a reliable source of information upon that subject; and if he is not, the consequences should fall upon him who named him, who knew, or ought to know, his character, and, especially, whether he lay under any special temptation to misrepresent. That, in the present case, was the secret of the entire fraud practised upon the plaintiff. If the plaintiff had known what Preston knew of Wooster's motive to deceive him in regard to Preston's credit, he would have placed no reliance whatever upon him. He would, from the very first, have suspected his sinister design. To say, then, that he was the plaintiff's agent, and not Preston's, in giving this character, (for he clearly was the agent of one of them,) is little less than absurd.

I should be content to hold, in a case like the present, that the mere fact, that the plaintiff was deceived as to the facts, at the time he gave the credit, and that Preston knew that he was so deceived, or he would not have parted with his goods, is a sufficient ground, according to the case of *Bruce* v. *Ruler, ut supra,* to entitle the plaintiff to rescind the contract *at his election.* But it is not necessary to go that length in the present case.

*Judgment reversed and new trial,*