### AULTMAN, MILLER & CO. v. C. C. CARR ET AL.

Delivered May 29, 1897.

1. **Commercial Ratings—Detailed Statement of Merchant—Duty to Examine.**

The seller of goods is entitled to rely upon the commercial rating of the buyer based upon the buyer's detailed statement, and is not bound to examine the detailed statement for himself.

2. **Sale—Fraud of Buyer—Rescission.**

Where a purchaser of goods had made false statements as to his indebtedness, to commercial agencies, and the seller was induced to make the sale in reliance upon the credit given him by such commercial agencies from such statements, and the purchaser had executed a deed of trust for certain creditors before the arrival of the goods, which was held open and made to cover the goods immediately upon their arrival, held, that the sale was consummated by fraud and the seller was entitled to a rescission.

APPEAL from Titus. Tried below before Hon. JOHN L. SHEPPARD.

*Porter & Cohron,* for appellant.—1. Information concerning the liability, financial condition, credit, rating, and standing of commercial men may be communicated through commercial agencies by signs and symbols, to be interpreted by means of a key. And if an insolvent merchant makes a false statement to such commercial agencies, and a vendor examines lists or reports which are obtained by the device and fraud of the vendee, and the same are believed and acted upon by the vendor in good faith, it is sufficient to cancel the sale on learning of the fraud. Bradstreet v. Gill, 9 S. W. Rep., 753; Crew v. Bradstreet, 7 L. R. A., 661; Dow v. Lockwood, 4 N. E. Rep., 500; Factory v. Lerdrum, 10 N. W. Rep., 900; Kraus v. Thompson, 14 N. W. Rep., 266.

2. To permit a false rating to be carried in a mercantile agency, giving an insolvent firm a rating to which it is not entitled, when the firm assigns three days after receiving goods sold on the faith of such rating, is sufficient evidence that the goods were bought with intention not to pay for same. Lindauer v. Hay, 61 Iowa, 663; Taylor v. Mississippi Mills, 1 S. W. Rep., 283; Lee v. Simmons, 27 N. W. Rep., 174.

*Humphreys & McLean,* for appellees.—Before appellant had the right to rescind the contract of sale on the ground of false representations made by Morris, it was incumbent on it to show that such misrepresentations were made to appellant by him, or were made to the commercial agencies and by them reported to appellant, before the sale was made, and that it acted on the statements made by Morris in making the sale.

LIGHTFOOT, CHIEF JUSTICE.—This suit was brought by appellant, Aultman, Miller & Co., against appellees, C. C. Carr and T. C. Morris, to recover a carload of buggies, upon the ground that they were procured from appellant by T. C. Morris, a merchant at Mount Pleasant, under a contract of purchase and under the representation that the latter was solvent; that Morris made false statements of his financial condition; that he was insolvent when the goods were ordered, never intended to pay for them, and on the day of their arrival turned them over to C. C. Car as trustee, in fraud of appellant's rights.

Appellees denied the fraud, and alleged that the statements were not willfully false, and set up the deed of trust to secure valid debts, etc. The case was tried before a special judge, and there was a judgment against plaintiff, from which it appeals.

The conclusions of fact and law filed by the court below are as follows:

"1. Plaintiff is a corporation of Akron, Ohio, wholesale dealers in vehicles and farming implements, doing business in Texas with headquarters at Dallas, Texas, with R. K. Earnest agent for their Texas trade.

"2. On September 18, 1895, a carload of buggies was sold by the plaintiff, owner of said goods, through its Dallas agent, or order, through its traveling salesman, W. W. Petty, subject to the approval of R. K. Earnest, to T. C. Morris, of Mount Pleasant, Texas, for $1543, which was their value.

"3. At the time of sale, before acting on said order, plaintiff's agent at Dallas examined the quarterly commercial reports of R. G. Dun & Co. and Bradstreet & Co., and found in the Dun report, 'T. C. Morris, F3.' 'F' meant that Morris was rated at from ten to twenty thousand dollars, and '3' meant that his credit was good. And in the Bradstreet report he found, 'T. C. Morris, Tc.' 'T' meant that Morris was rated at from ten to twenty thousand dollars, and 'c' meant that his credit was very good. The plaintiff's agent, finding that said report was satisfactory, accepted the order as sent from T. C. Morris, and directed his house at Akron, Ohio, to fill the same on four months' time. The plaintiff ordered the buggies from the factory of Rattermann & Luth, of Cincinnati, Ohio. The plaintiff's agent at Dallas believed what the characters in the reports meant were true, and relied on them solely for the rating and financial standing of said T. C. Morris, when he accepted his order.

"4. On March 15, 1895, T. C. Morris, at the request of the Dun Agency, at Shreveport, La., made it a report, in which he stated that his assets amounted to about $27,000 and his liabilities to about $11,000; but failed to state therein the sum of about $10,000 or $15,000 (and a

$2000 note which he executed to her in 1893), which he had on deposit belonging to his widowed mother, which sum he had collected for her, and had full authority from her to do with it as he pleased, as he was her agent to manage and control her affairs, and had been for three or four years since his father's death, and other indebtedness of $4700, loss on cotton in spring of 1895, prior to date of statement, and he claimed to hold this sum as bailee and did not regard it as a debt, although at times he used some, and at others all of it in his business. And Morris admitted that he could not pay off his indebtedness, as it matured during the summer and fall of 1895, and that he furnished his mother money along at times, whenever she called on him for it.

"5. T. C. Morris did not execute the four notes for the buggies as agreed, nor pay for same, and said debt is yet unpaid. I find that said statement of March 15, 1895, by T. C. Morris to the Dun Agency, was false, and that it showed on its face that it was made as a basis for credit.

"6. The buggies were received at Mount Pleasant, Texas, by Morris on the morning of October 12, 1895, and in the evening of the same day he transferred them by deed of trust to C. C. Carr, as trustee, to secure the payment of preferred creditors in the sum of about $34,000, and said buggies were on October 16, 1895, demanded from the defendant by the plaintiffs, who, learning the true condition of affairs, undertook to cancel their trade.

"7. On October 12, 1895, T. C. Morris conveyed by deed of trust to C. C. Carr, his uncle, all of his stock, including these buggies, to secure the First National Bank of Mount Pleasant and his mother, and other bona fide creditors of T. C. Morris, in the sum of $34,000, the bank's debt being about $4500, and his mother's about $16,000; none of said creditors paid anything of value for said goods, but the consideration therefor was pre-existing debts; and that the trustee and all of said creditors acted in good faith, and did not know of the statement made by T. C. Morris to the Dun Agency, or how said goods were procured, and it appears that said debts were bona fide and unpaid at that time.

"8. That afterwards the buggies were seized by writ of sequestration for plaintiff, and were replevied by C. C. Carr, trustee.

"9. The buggies were not delivered by the trustee and the sureties on his replevin to abide the judgment of the court.

"10. All of the papers in the sequestration suit, writ, bond, and return, and the replevin bond of C. C. Carr, in the sum of $3000, with Judge Shepherd and E. S. Lilienstein as sureties, were in evidence before the court.

"11. Neither the statement made by T. C. Morris to the Dun Agency nor a copy thereof were seen by the plaintiff or its agent, nor its contents communicated to it until after the 12th day of October, 1895, and the 'F3' sent out by the Dun Agency in July, 1895, was based on the statement of March 15, 1895, made by T. C. Morris, and other sources of information from Mount Pleasant on inquiry of said agency. Morris had a good credit before he made the statement to the Dun Agency of March

15, 1895, and he had been making similar statements to said agency for several years, but had not included the indebtedness to his mother in either statement."

The court below upon the above facts found the following conclusion of law:

"Upon the foregoing facts we conclude as a matter of law that the plaintiff can not recover in this cause, because the statement made by T. C. Morris to the R. G. Dun Agency on March 15, 1895, and the representations contained therein, were neither known by nor communicated to the plaintiff prior to the time of the sale of the buggies, and not until after the deed of trust had been executed and filed, and hence could not have been relied on by plaintiff as an inducement to make the sale."

We adopt in the main the conclusions of fact found by the court below, with the following additions and corrections: The carload of buggies was ordered September 18, 1895. The exact day of shipment is not known, but they arrived at Mount Pleasant October 12, 1895. From the testimony of appellee, T. C. Morris, which is not disputed, it appears that when his creditors began to press him, about October 1, 1895, he executed to his mother his note for about $16,903, which had been due her for some years. That some time in September, 1895, he executed to Rice, Stix & Co. his three checks for $700 each, the first due in two weeks, and the others two weeks apart, which he knew he could not pay as soon as the agent was gone. Two or three days before October 12, 1895, he spoke to his attorneys about preparing the deed of trust; it was prepared, and the name of the trustee was not inserted until October 12, 1895. On that day the carload of buggies arrived in Mount Pleasant, were unloaded into the storehouse, and included in the deed of trust. It is manifest, from the undisputed evidence, that at the time the buggies were shipped and at the time of their arrival at Mount Pleasant, Morris was insolvent and knew it, and did not expect to be able to pay for them, but had begun to arrange his affairs to close up his business.

It also appears that at the time Morris made his statement to the mercantile agencies in order to get credit, and upon the basis of which appellant relied, he represented that he had a surplus in his business over and above his debts of about $16,300, when in fact, if all his debts had been paid, he would have had nothing. That he left out of his statement his indebtedness to his mother of more than $16,000, and what he owed for losses on cotton $4752, and which latter, it seems, he borrowed money from the bank to pay two days after the statement was made; and yet these statements were left uncorrected as his basis of credit.

The appellant has presented in its brief a number of assignments of error and propositions of law thereunder, but without attempting to go into a discussion of them in detail, we deem it sufficient to say that under the undisputed facts the court should have rendered judgment for the appellant.

The statement made by appellee Morris to the commercial agencies,

and upon which they fixed his credit, was made for the purpose of giving him a commercial standing among wholesale merchants from whom he expected to buy goods. He expected them to act upon it, and the undisputed evidence shows that appellants did act upon it in agreeing to sell him the goods. This statement is admitted to be untrue. Instead of an indebtedness of only $8000 for merchandise and $3000 to the bank, it was shown by his own testimony that he also owed his mother $16,903, and to outside parties for losses on cotton $4752, making a total indebtedness of about $31,655, instead of a total of $11,000, as stated by him. His total available assets, as stated by him, was only $27,300, besides some landed interests which he estimated at $3000. So that if he had given to the commercial agencies a correct statement of his condition, he was really insolvent when the statement was made, and must have known it. If he did not know it then, he certainly knew it when the buggies were shipped by appellants, at which time he had executed his notes for most, if not all, of it, and his creditors were already pressing him. It seems that when appellant was carefully shipping him the goods, he was carefully preparing to transfer them to a trustee for the benefit of other parties, and the deed of trust, which had been left open for several days, closed upon them the very day of their arrival. To hold the seller to such a bargain as this would be to put a premium on fraud.

It is urged by appellee that at the time he made the statement to the commercial agencies, he did not think of any indebtedness to his mother, as she had at all times allowed him to handle her assets as he pleased, and that he had also overlooked the indebtedness of $4752 due for losses on cotton. If this should be true, he certainly thought of the last named debt when he executed his note for it to the bank two days after his statement, and of the debt to his mother, when he executed his note to her about October 1st, at which time his creditors were pressing him. The buggies were not received until October 12th.

The learned court in its conclusion of law found against appellant on the ground that, at the time the buggies were ordered by Morris, appellant had not examined his detailed statement to the commercial agencies, and hence could not have been influenced by them. This position is not tenable. The statement made by Morris of his condition had fixed his credit in such agencies, and appellant examined it as thus fixed, was influenced by it, and was thus induced to agree to sell him the goods. He did not comply with the terms of purchase, and could not have reasonably expected to have done so.

The rule in such cases is very fully discussed in the case of Eaton v. Avery, 83 New York, 31, and in discussing that case our Texas courts copy from that opinion as follows: "A person furnishing information to such agency in relation to his own circumstances, means, and pecuniary responsibility, can have no other motive in so doing than to enable the agency to communicate such information to persons who may be interested in obtaining it for their guidance in giving credit to the party; and if a merchant furnishes such an agency a willfully false statement of his

circumstances or pecuniary ability, with the intention to obtain a standing and credit to which he is not justly entitled, and thus to defraud whoever may resort to the agency, and in reliance upon the false information there lodged extend a credit to him, there is no reason why his liability to any party defrauded by those means should not be the same as if he had made the false representation directly to the party injured." Gainesville National Bank v. Bamberger, 77 Texas, 54.

In this case, the sale of the goods could not have been completed until their delivery to the carrier. At that time Morris was not only insolvent, but his creditors were pressing him and he knew it. At the time the goods were received at Mount Pleasant he had for several days had the deed of trust prepared, leaving a blank for the name of the trustee, and on the very day of their arrival the name of the trustee was inserted and the deed delivered. Donaldson v. Farwell, 93 U. S., 631; Stewart v. Emerson, 52 N. H., 301; Jordan v. Osgood, 109 Mass., 457; Wiggin v. Day, 75 Mass., 97; Fitzsimmons v. Joslin, 21 Vt., 129; Belding v. Frankland, 8 Led. (Tenn.), 67; 41 Am. Rep., 630, and note; 1 Benj. on Sales, 656, 657; Tied. on Sales, secs. 168, 170.

At the time the claimed purchase of the goods was completed, the purchaser could not have reasonably expected to pay for them. As was said by Judge Cooper, in the case of Belding v. Frankland, above, while mere insolvency of the purchaser without more will not always suffice to avoid a sale, "yet the fraudulent intent may be deduced from the facts and curcumstances, without any actual representations, full knowledge by the purchaser of his insolvency being always a controlling element. * * * If the vendor may recover possession of the goods against the vendee, he has the same right against an assignee under a voluntary assignment for the benefit of creditors, who stood in the shoes of the assignor." 41 Am. Rep., 632. See, also, Scram v. Strouse, 28 S. W. Rep., 263; Bugg v. Shoe Co., 40 S. W. Rep., 134; Morrison v. Adoue, 77 Texas, 35.

For the error of the court as above indicated, the judgment must be reversed, and it appearing that the goods of appellant were sequestered, and replevied by appellee C. C. Carr, who has since sold and disposed of them, judgment will be here rendered for appellant against T. C. Morris, and also against C. C. Carr and the sureties on his replevy bond for the sum of $1543, the value of said goods, with legal interest from November 11, 1895, the date of the filing of such bond, with costs.

*Reversed and rendered.*