## KAYSER v. MAUGHAM.

1. Resulting and constructive trusts, like implied trusts, are said to arise by operation of law upon the transaction of the parties; but unlike the latter there is no fair implication of an actual intention to create a trust. In resulting trusts the law sometimes presumes an intention, but this is a legal fiction.

2. The essence of constructive trusts seems to be fraud, deceit or bad faith, no effort being made to include them in the intention of the contracting parties.

3. An express agreement providing for a partnership as such is not necessary to create the relation; that a partnership may exist as to a single transaction is elementary; community of losses is not essential to the partnership relation.

4. The statute of frauds has no application to resulting or constructive trusts, because both are created by operation of law.

5. A trust in land cannot be predicated upon proof of an agreement to create a partnership for the purpose of purchasing and handling or improving the same, the partnership relation not having existed prior to acquisition of title, and no partnership funds having been invested in the property.

6. If A., holding a trust fund, invests from his private funds, in property for the purchase of which there has been no discussion between him and his *cestui que trust*, no court will attempt, from the mere fact of his being a trustee, to fasten upon the realty bought a trust estate in favor of his beneficiary.

7. Suit being brought for an equitable estate in realty claimed to arise as a resulting or constructive trust through partnership transactions, and such relief being denied, a court of equity may retain the cause and proceed to an accounting and settlement of the partnership affairs, provided the evidence indicates a necessity for such accounting and the pleadings are consistent therewith.

8. Under section 54 of the Civil Code, in contested cases, the prayer for relief in the complaint is a matter of no significance; it is the duty of the court to grant such relief as the pleadings and evidence warrant whether demanded or not.

*Appeal from District Court of Hinsdale County.*

THE facts are stated in the opinion.

Messrs. LUTHER S. DIXON, J. W. MILLS and A. R. BUSHNELL, for appellant.

Mr. CHARLES E. GAST, for appellee.

HELM, J.   This is an action in equity.   It was brought for the purpose of compelling defendant to convey to plaintiff the legal title to one-half of a certain mine in the complaint described; and to account for and pay over one-half of the proceeds from the working thereof.   The theory upon which the complaint was drawn is that the defendant obtained title to the mine named, with the assistance of plaintiff, through an equal copartnership arrangement between them, initiated for the purpose of purchasing and selling the same to third parties.   That upon repayment to defendant of one-half the purchase price, plaintiff is entitled to a decree in equity declaring that defendant holds one-half of the property in trust for him.

The aid of a jury to settle questions of fact was not invoked, neither was a referee or master called upon to take testimony or report findings; the cause was tried to the court, and the chancellor met the witnesses face to face and heard their testimony.   The record is, therefore, not incumbered with exceptions to the findings of a master or objections to the charge given a jury.   No question arises upon the pleadings.   The matters to be determined relate exclusively to the evidence and the law applicable thereto.

The first twenty-three assignments of error challenge the reception or rejection of testimony, and most of them are entirely without merit; in three or four instances it would probably not have been error had the court ruled differently; but these rulings were not of sufficient importance to warrant a reversal.   Upon careful consideration thereof we conclude that the mistakes in this particular, if any there were, constituted errors without material prejudice to the plaintiff.   That counsel are of the same opinion may be assumed from the fact that they ignore these questions in argument.

The twenty-fourth assignment is the only one which we shall consider at length; it reads as follows:   "The

court erred in giving judgment and entering decree in favor of defendant in this case; the evidence is insufficient to justify the same, and it is against the law."

Two questions, it will be observed, are here presented, viz.: Did the court err in resolving the material matters of fact in favor of defendant? And are its legal conclusions resting upon its findings of fact in accordance with pertinent established principles prevailing in equity?

As to some of the important questions of fact there is conflicting testimony; in passing upon these conflicts we are not hampered by the verdict of a jury; and in reviewing the cause upon the evidence, are embarrassed only by the fact that the *court* below possessed superior facilities for judging of the credibility of witnesses. Uninfluenced by the latter consideration, however, and examining these controverted matters as though no other court had passed in-judgment thereon, we would, upon the whole record, arrive at the same conclusions of fact as did the district court. The further discussion of this case is, therefore, narrowed to the latter question above stated. This is the subject upon which the numerous briefs and elaborate arguments of counsel mainly bear.

If plaintiff is entitled to recognition as half owner of this valuable mine, it is, of course, because under the evidence a court of equity will be warranted in regarding defendant as holding such interest in trust for him. There is no instrument or agreement creating in direct terms a trust relation between the parties; there is, therefore, in this case no *express* trust. Neither could a court from agreements, coupled with surrounding circumstances, reasonably infer that the parties actually *intended* to create a trust in the property; hence we may exclude from our consideration the subject of *implied* trusts.

Plaintiff must base his hope of success upon the doctrines of resulting or constructive trusts. They, like implied trusts, are said to arise "by operation of law upon the transactions of the parties;" but unlike them, there

is no fair implication of an *actual intention* to create a
trust. In the former — resulting trusts — the books
sometimes say that the law presumes an intention; but
this is a legal fiction, and the real foundation of the re-
sulting or presumptive trust is the "natural equity"
springing into life through fraudulent or inequitable ad-
vantages obtained by means of agreements, express or
implied, and accompanying acts of the parties.

A leading distinction between constructive trusts on
one hand, and express, implied or resulting trusts on the
other, is that the former do not rest upon an *intention*
expressed by the contracts of the parties, or reasonably
implied, or presumed as a legal makeshift to do justice,
from such contracts coupled with the relations and acts
of the parties; their essence seems to be fraud, deceit or
bad faith; they (constructive trusts) are said to be "thrust
upon a party contrary to his intention and against his
consent," no effort being made to include them within
the intention or contemplation of the parties in making
the contract or performing the acts "from which they
are construed by the court." 1 Perry on Trusts, secs.
73, 112, 124 and 166.

But the principles relating to resulting and construct-
ive trusts are in some important particulars identical;
and, for reasons which will hereafter appear, we deem it
unnecessary to prolong this opinion by a separate discus-
sion thereof with reference to the facts and circumstances
shown by the record before us, although counsel have
done so in their briefs and arguments.

If either of these trusts is here disclosed, it arises as
substantially averred in the complaint through the fidu-
ciary relation held to exist between copartners. Hence,
we are required to dispose of two preliminary questions,
viz.: was there a partnership, and if so, what were its
nature, purposes and issue?

An express agreement providing for a partnership as
such is not necessary to create the relation. In law a

partnership is often implied from the acts and interests of the parties, although the words *partnership* or *partners* may never have been used by them in connection with the business. It is likewise elementary that a partnership may exist as to a single transaction or enterprise.

Defendant temporarily controls four-fifths of the Belle of the West mine; plaintiff, through his power of attorney, has authority to sell the remaining fifth; they attempt to find a purchaser for the entire property at such a price as will enable them to secure satisfactory profits. To this end they work together. Bonds, and ultimately escrow deeds, are made to defendant alone; but this is avowedly for the purpose of convenience in handling the property. Plaintiff is interested in the sale; he procures and furnishes at his own expense an abstract of title to the fifth which he represents; he finds and introduces to defendant an ostensible purchaser, and does what he can to secure the sale. Concerning their interests in the enterprise, they execute under seal the following instrument:

"Memorandum of agreement made and entered into this 31st day of October, A. D. 1879, by and between Meyer Kayser and John H. Maugham. Witnesseth, that, whereas the said parties hereto are endeavoring to consummate a sale of the Belle of the West mine, for their joint benefit, for the sum of forty-two thousand five hundred dollars ($42,500); and, whereas, said parties hereto have agreed to divide equally the profits of said sale, if made; and, whereas, said profits, less the expense of making said sale to date, will amount to the sum of twenty thousand eight hundred and forty dollars ($20,840); and, whereas, the whole of said purchase money, including the profits, is to be paid to the said John H. Maugham; now, therefore, in consideration of the premises, the said John H. Maugham hereby agrees with the said M. Kayser that should said sale be consummated, he, the said John H. Maugham, will immediately, after the re-

ceipt of the purchase money as above, pay to the said M. Kayser the sum of ten thousand four hundred and twenty dollars ($10,420), or will place that amount to his credit at the Miners' and Merchants' Bank of Lake City, less one-half ($\frac{1}{2}$) of all necessary expenses that may hereafter be incurred in making said sale, or in transmitting or collecting the purchase money received therefor. In witness whereof we have hereunto set our hands and affixed our seals, the 31st day of October, A. D. 1879.

"JOHN H. MAUGHAM. [SEAL.]
"MEYER KAYSER." [SEAL.]

By this writing we are apprised of the following facts, viz.: That the parties are "endeavoring to consummate the sale" for their "joint benefit;" that if the particular sale mentioned is made, they are to divide *equally* both the *profits* and *expenses;* that, inasmuch as the said profits will all come into the hands of defendant, he is, at once, upon receipt thereof, to pay over to plaintiff his moiety, less half of the expenses. It makes no difference what the immediate purpose in executing this instrument was; it is the voluntary act of the parties, and characterizes, beyond doubt, their relation, at least as to the particular contract of sale mentioned therein. No provision is made for the payment of losses; but none are expected, and, aside from the incidental expenses, none can accrue. Besides, community of losses is not essential to the partnership relation. Parsons on Part. 42.

We think plaintiff and defendant were partners. They acted together in a common adventure, and they were to divide equally the profits *as such*, and also the expenses in case of success therein. But the purpose and scope of this partnership was simply to effectuate a sale of specific property belonging entirely to third parties; neither of the partners owned any interest therein, and it was not contemplated that, as partners, they would purchase the same, or, in any event, become interested in the *title;* in reaching the purchaser the title was to pass through

defendant; this, however, as already suggested, was a mere matter of convenience; the only property which the firm was to possess, as its own, was the profits acquired through the sale over and above the price demanded by the owners.

It will be noticed by reference thereto, that the agreement above set out speaks of one particular negotiation. This negotiation was with a New York party; after two extensions it was to culminate on December 10, 1879, in the payment of the purchase price and delivery of the deeds; but on that day the bond giving defendant control of the four-fifths interest would expire; he was informed, and plaintiff knew, that no further time would be allowed defendant by the owner of this interest to dispose of the same; therefore, on December 10th, the business of the partnership must have ended; for if the sale were not made the partners would have no further control of four-fifths of the property; and if the sale was consummated, nothing remained to be done except the settlement or accounting between them according to contract.    The New York party did not perform his promises; no other third person stood ready to buy; the purpose of the partnership had utterly failed of accomplishment.    At this juncture, and without informing plaintiff, defendant from his individual funds, except as hereinafter shown, advanced the purchase money, some $20,000, and took title to himself of the entire property, duly recording the same.

The position of counsel for defendant concerning the statute of frauds is not well taken.    If, as already declared, a trust exists at all in this case, it belongs to the class known as resulting or that denominated constructive; but these trusts are created by operation of law, and the statute of frauds has no application thereto.    Gen. Stats. sec. 1516; Browne on Stat. of Frauds, sec. 83 *et seq.*

It is true that a trust in lands cannot be predicated upon proof of an oral agreement to create a partnership

for the purpose of purchasing and handling or improving such lands, the partnership relation not having existed prior to acquisition of title, and no partnership funds having been invested in the property. To recognize a trust in such cases would be to abrogate the statute of frauds in this particular; it might as well be said that an oral contract providing directly for the purchase of an interest in lands is not obnoxious thereto. But the foregoing principle is not applicable to the case at bar, for the reason that here the partnership existed several months prior to the acquiring of title by defendant; that the partnership contract does not rest entirely in parol; and that the *purchase* of the mine was not contemplated by this contract.

To sustain the proposition that equity will recognize a resulting or constructive trust in favor of plaintiff as to one-half of the Belle of the West, the lode in controversy, we must find that, in procuring title to the property, defendant perpetrated a fraud, actual or constructive, upon plaintiff, or improperly reaped the personal advantage of ownership through a bargain entered into for the benefit of the partnership; that in some particular he violated the principle requiring the utmost good faith between parties to this relation.

Realizing the importance of showing such violation, plaintiff averred fraud in his complaint, and made strenuous efforts to sustain the averment with proofs. He attempted to show that intending to acquire title for himself, and in repudiation of plaintiff's interests, defendant prevented a successful termination of the negotiations for a sale to third parties; that he falsely and for sinister purposes represented that no further extension on the Wade four-fifths interest could be obtained; and that it was never his intention to consummate the sale of the mine or carry out in good faith his contract with plaintiff.

This effort was, in our judgment, futile. A careful

scrutiny of the evidence fails to reveal any adequate ground for these charges. The very testimony in part sought by plaintiff to establish them shows exactly the contrary. It appears that, throughout the entire transaction, defendant endeavored, with the utmost industry and good faith, to sell the property and secure for himself and plaintiff the profits in view; and that *his* efforts contributed far more toward the anticipated success of the partnership adventure than did those of the plaintiff. Even after, as he thought, becoming the absolute owner of the entire property, he consented, upon the importunity of plaintiff, to give the New York party five days additional time to purchase the mine on the terms previously agreed upon; and, after granting this favor to plaintiff, he gave still another extension upon condition of part payment on the 15th of December. There can be no doubt but that, when he allowed these extensions, he honestly believed that plaintiff had no legal claim upon him, so far at least as the property itself was concerned. The latter appealed to defendant's sympathies, and sought the extension as a personal favor; in this spirit, partially, it was granted; partially, also, no doubt, upon the agreement allowing him $1,500 from plaintiff's share of the profits if the sale were made.

Cousel argue that the consideration for this one thousand five hundred dollar arrangement was the use of the purchase money theretofore advanced, as they claim, for the benefit of the partnership, by defendant from his own pocket, in buying the property; but we are satisfied from the evidence that the extension mentioned was in fact the consideration for this agreement.

We find no sufficient ground for imputing to defendant bad faith in these particulars. Nor did he obtain an unconscionable advantage through the partnership, *i. e.*, improperly use the confidential relation to procure an individual benefit for himself. When he took the title, the partnership enterprise had proved a failure. At the last

moment, before the bond for four-fifths of the mine expired, for reasons apparent in the record, he made the purchase; as to the remaining fifth he also took up the escrow deed; but it may be noted ·in passing that he might have obtained this title directly from Mears. At no time·was plaintiff's control thereof exclusive; Mears held, and twice tried to exercise, the right to sell, notwithstanding his power of attorney to plaintiff.

It is true, as we shall hereafter see, that partnership funds were used in procuring from Wade the extension to December 10th; the partnership·had reaped no advantage, however, from this extension; and but for the act of defendant in making the purchase, the money so paid would have been absolutely forfeited. There is not the slightest ground for a pretense that any one else would have bought the property before it had irrevocably passed from the control of the partnership; and it would be a harsh and unwarrantable finding for a court of equity to say that the evidence requires a decree ordering defendant to divide title to the mine with plaintiff. Such a conclusion could only rest upon the misapplication of a beneficent rule relating to partnership transactions. It is true that defendant purchased a few hours or moments before the partnership lost control of the four-fifths interest; but under all the surrounding circumstances we are of opinion that this fact is of slight importance. We do not believe that this is a proper case for the application of the partnership rule relied upon. We accede to the force of some of counsel's suggestions; but cannot conclude that any principle of justice or equity would sustain us in finding, as a matter of law, that defendant advanced the $18,500 purchase money for the benefit of the partnership business.

Plaintiff's claim to a half interest in the mine must be denied.

It appears, however, that the sum of $2,500 was at one time paid to defendant by the New York party upon the

purchase price; through his failure to secure the balance, this sum was forfeited by the would-be purchaser; it came into defendant's possession as one of the partners through the partnership business; and unquestionably it became partnership property. After substracting expenses therefrom, under our view of the written agreement above stated in full, plaintiff was half owner of the remainder. But in order to procure the extension from Wade to December 10th, upon the four-fifths interest, defendant advanced him on the purchase price, and as a forfeit, $1,500 in money; this extension was obtained for the benefit of the partnership enterprise, and we must presume that the money advanced was from the partnership funds in the possession of defendant. Had the Wade interest not been bought, we do not doubt for a moment but that this forfeited sum would have been accounted expenses, and deducted from the $2,500 of partnership profits. The price of the Wade interest agreed upon at the time of granting the extension last above mentioned was $17,000. Defendant himself testified that on December 10th, he paid Wade this amount, less the $1,500 theretofore advanced, to wit, $15,500. Considering that defendant paid the latter sum, and also $3,000 for the Mears interest, from his private funds, the fact remains that he received the benefit of the $1,500 partnership advancement; and when he chose to accept the advantage of the partnership forfeit thus advanced, he also accepted the legal consequences following his act.

What were these consequences? It is contended on one side that he thereby became a trustee for the firm to the extent, at least, of a proportionate interest in the mine; it is urged on the other side, that this sum was absolutely forfeited and lost so far as the partnership is concerned, and that defendant's action created no sort of an obligation or liability in favor of plaintiff or the firm. Had this money been advanced or invested in the first instance, with a view to the *purchase of the property for*

*the partnership*, a resulting or constructive trust might
have been created; on the other hand, had the partner-
ship business absolutely terminated, the control of the
four-fifths interest reverting entirely to its owner, and
had he subsequently sold to defendant for $15,500, giv-
ing the latter the benefit of the one thousand five hun-
dred dollar advancement as a personal favor, it may be
that the partnership, in the absence of any bad faith on
defendant's part, would be entitled to no benefit what-
ever by reason of the purchase; this position, however,
is not entirely free from doubt, and we do not assert its
correctness.

But the advancement of this $1,500 was originally
made solely with a view to obtaining more time within
which the firm might realize a profit as brokers through
a sale to some third party.   At the date of paying this
money, there was no intention to have the *title* pass to
the firm or either member thereof, except a sale was first
concluded to another; and the fact that, in the latter
event, the title would incidentally pass through defend-
ant, is of no significance whatever; it was merely one of
those formalities often resorted to for the purpose of
securing certainty, celerity and convenience in such
transactions.

There was, in this advancement, no departure from
the original purposes of the partnership.   We have
already determined that the evidence clearly warrants
the conclusion that defendant acted throughout the trans-
action with the most scrupulous fidelity to the partner-
ship interests; and that in buying the property he took
no such advantage of the fiduciary relation as would
justify a declaration in equity that he advanced the pur-
chase money for the firm; and that upon repayment of a
moiety thereof, plaintiff would be entitled to one-half of
the property.   Did defendant's purchase, a few hours
before the partnership relation terminated, under the
circumstances, in and of itself alone, create a resulting

trust in favor of the firm as to the three-fortieths of the mine,— the proportion of the entire purchase money represented by the one thousand five hundred dollar advancement?

There is no actual fraud or bad faith. In availing himself of the benefit of this advancement, was defendant guilty of such constructive fraud as *ipso facto* produces a constructive or resulting trust? Courts of equity carefully avoid giving positive and specific definitions of fraud; human ingenuity would, doubtless, discover ways of evading such definitions, though worded with the utmost learning, discernment and skill. Only the most general declarations on the subject are ventured; such as that it is "the unlawful appropriation of another's property, with knowledge, by design, and without criminal intent." Also that, in equity, it "includes all acts, omissions or concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." 1 Bouvier's Law Dict. 612 and 613. But, while this is true, there have been attempts at a classification of frauds under different general heads. The one that appears to be most widely accepted is that of Lord Harwicke, in *Chesterfield v. Janssen*, 2 Ves. 155; it is thus stated by Mr. Bouvier: "1st. Fraud, or *dolus molus*, may be actual, arising from facts and circumstances of imposition. 2d. It may be apparent, from the intrinsic nature and subject of the bargain itself. * * * 3d. It may be inferred from the circumstances and condition of the parties. * * * 4th. It may be collected from the nature and circumstances of the transaction, as being an imposition on third persons."

Adopting the foregoing classification it is obvious that the constructive fraud in this case, if such there was, must be "apparent from the intrinsic nature and subject of the bargain itself;" or, it must be "inferred from the circumstances and condition of the parties." It cannot

arise under the former head, because there is nothing in the "intrinsic nature and subject of the bargain" which would render the transaction unreasonable, dishonest or unfair so far as either plaintiff or defendant is concerned. It is not embraced by the latter head, for the reason that, as already shown, no unconscientious advantage is here taken of the fiduciary relation; no unjust or inequitable benefit is derived by defendant through plaintiff's weakness, necessity or ignorance. Nothing need be added to what has already been said upon the evidence and conclusions of fact properly deducible therefrom, in support of these statements.

Viewed in the most reasonable light, defendant's conduct amounts simply to this: In making a private purchase after there was no longer a hope of success in the partnership business, he availed himself of a comparatively small advancement by the firm that would otherwise have inevitably been forfeited; an advancement made for a collateral purpose, and not with a view to obtaining title for the firm to the property bought. Thus he prevented the absolute forfeiture and saved to the partnership the sum of $1,500. After taking the title he breathed new life into the partnership *business*, by extending the privilege which would otherwise have been lost, of realizing the profits anticipated through a sale of the property. Defendant obtained a benefit from the partnership investment, it is true, but in so doing he took no advantage of the firm, and no loss or injury or disadvantage in any way accrued to the partnership or through it to the plaintiff. On the contrary, as before stated, two direct and positive benefits were secured to the firm by the transaction, viz.: First, additional time was obtained for consummating the sale to the New York party, and second, $1,500 were saved to the partners.

At the time of procuring the last extension from Wade, defendant, besides paying the $1,500 forfeit money above

mentioned, also loaned him an additional thousand dollars without interest; and it is urged that this constituted the remainder of the $2,500 theretofore paid to defendant for the extension to the New York party; and that by reason of this loan, also, the plaintiff through the partnership obtained some equity in the mine. If this transaction could in any event be considered as a loan from partnership funds, it cannot be regarded as producing the effect contended for. This money did not, like the $1,500, become a part of the purchase price; the evidence justifies the conclusion that it was afterwards accounted for to the defendant; and he would have held it as a trust fund had he not bought the mine. For the purposes of the argument, we may assume that he held it in his possession on December 10th, when he made the purchase. But he had ample means of his own to pay the entire purchase price for the property; and there being no design of the partnership to buy for itself, and no advantage being taken of a fiduciary relation, equity will not attempt to follow this money into the mine. As to this sum, the case before us, under the other facts above narrated, may be considered analogous to that where A., holding a trust fund, invests from his individual resources in property for the purchase of which there has been no discussion between him and his *cestui que trust*. A. must account for the trust fund, but no court will attempt, *from the mere fact of his being a trustee*, to fasten upon the realty bought, a trust estate in favor of his beneficiary.

We are, therefore, of opinion that equity ought not to decree a trust in plaintiff's favor as to any portion of the mine in controversy. In support of this conclusion a number of considerations not hitherto noticed might be mentioned. If a trust existed, resting upon the fraud or bad faith of defendant clearly established, we are hardly willing to declare that plaintiff's laches alone in beginning his suit would be sufficient to prevent a decree

in his favor.   But on the other hand, his hesitating and vacillating conduct is not such as to commend him strongly to the favor of a court of equity.   While we are not fully prepared to say that he remained silent too long, when he ought to have spoken, and that now equity will not permit him to speak when he ought to be silent, yet his petition will be listened to with less indulgence than if he had been more consistent and diligent.

Upon making the "astonishing" discovery that defendant had taken the title and placed the deeds of record, plaintiff offered to refund no part of the purchase money and affirmed no claim to an interest in the mine; no such interest was asserted until about the commencement of suit, some twenty months later.   During these twenty months defendant expended the additional sum of $20,000 in prospecting and developing the mine without receiving any return.   Through such expenditure the value of the property was greatly enhanced, uncontradicted testimony showing two hundred and ninety thousand dollars' worth of ore in sight at the date of trial. Plaintiff stood quietly by and made no proffer of aid, financial or otherwise, in this development work.   He complained of unfairness in the purchase by defendant, but only asked, first, the extension to the New York party, and second, a promissory note for $10,000, payable when the mine should be sold.   The first request, as we have seen, was granted; the second was peremptorily refused.   He accepted, without objection, the $3,000 paid by defendant for the Mears interest, and accounted therefor to his principal.

Explaining his conduct in the foregoing and other particulars, plaintiff shows that he was in very bad health; that he was obliged to be absent from Lake City, where the mine is located, several months of the time; that on one occasion, in answer to his assertion that he had been wronged in the matter, defendant promised, "as a man

and a Mason," that upon sale of the mine he "would make it all right;" and that, at another time, he declared to a third person that he had "agreed to give Kayser a certain sum of money for his services * * * out of any proceeds of a sale made by him," and he should fulfill his engagement. This voluntary promise, which the evidence sufficiently establishes, necessarily indicates neither a claim of interest in the mine by plaintiff, nor an acknowledgment on the part of defendant of any such interest. On the contrary, it would seem to show a demand for compensation on account of *services rendered*, and a sort of recognition of the justice thereof. But it is insisted that, relying upon this assurance, plaintiff postponed taking earlier action to assert his right.

We do not perceive in these extenuating circumstances, however, any excuse for plaintiff's failure to sooner assert his claim of interest in the mine; and giving the evidence a construction most favorable to him, his conduct does not appear with that freedom from negligence and suspicion desired in equity. It invites the suggestions made by counsel for defendant, that plaintiff himself is guilty of bad faith, and does not come into equity with clean hands; that he did not believe himself entitled to any interest in the property, and at first had no idea of asserting such claim; that this suit was an afterthought, suggested by the success of defendant's development work, and the unexpected discovery of large quantities of valuable ore resulting therefrom; that plaintiff is simply attempting to share in the profits accruing from another's enterprise, investments and risks, though conscious that he has no equitable right thereto; a practice which is altogether too common in mining countries and cannot be too severely condemned. We do not affirm the justice of these strictures upon the foregoing and other acts of plaintiff; we simply say that they are not entirely devoid of plausibility and reason; that his standing in equity

would be much stronger had he pursued a different course; and that in a doubtful case, these matters might be sufficient tó turn the scale against him.

From what has already been said, it appears that, while we decline to recognize the existence in plaintiff's favor of a trust in the mine, we are nevertheless of the opinion that there are partnership profits in defendant's hands. No offer of an accounting nor specific demand therefor has been made. Defendant may have regarded the Wade transaction as a final disposition of the partnership profits; he may have thought that since the sale to the New York party was not consummated, plaintiff was entitled to no part of the forfeit money received, as the written contract provided only for an equal division of the profits in case a sale were actually made; or he may have awaited a request from plaintiff for the settlement. But in our judgment a fair construction of this contract requires an equal division of the net profits accruing in any way through the negotiations with the New York party. Defendant received the $2,500 forfeited. One thousand dollars of the sum are in his possession. One thousand five hundred dollars went indirectly into the purchase price paid for the mine; having accepted the benefit of this advancement by the firm, defendant ought to account therefor. But expenses were legitimately incurred by both parties while endeavoring to bring the partnership business to a successful issue; and this necessitates an account-ing and settlement. There is evidence tending to show that plaintiff's expenditures aggregated ten or twelve dollars, and those of defendant about $650. But the testimony in these particulars is indefinite and unsatisfactory, so that we are unable to enter a decree and judgment.

It is urged, however, by defendant's counsel, that this action cannot be converted into a mere money demand; also that, if plaintiff brought suit for his proportion of the $2,500, defendant would have a right to bring

in a "counter-claim" for $2,000, besides $660 expenses; and would thus be in position to recover a judgment against plaintiff. The $2,000 referred to represents an increase of the purchase price demanded by Wade in addition to the forfeit and loan above mentioned, for the last extension to defendant on the four-fifths interest, defendant thus being obliged to pay $17,000 for this interest, when, prior to the said extension, he might have bought it for $15,000. Counsel do not inform us upon what principle they rely in support of their proposition that this $2,000 would be a legitimate counter-claim. Defendant was under no obligation to make the purchase; plaintiff had no knowledge of his intention so to do, and certainly exerted no influence whatever in the matter. It was a purely voluntary act, and could not, under any possible view of the evidence, form the basis of a just demand against plaintiff.

Upon defendant's former proposition, that this action cannot be converted into a mere money demand, there need be no controversy. If by "money demand" counsel means a claim recoverable in a legal forum, the correctness of his position under the pleadings must be conceded. But the question is not as to the propriety of transforming an equitable action for the recognition of a trust in realty into a suit at law in the nature of debt upon an account stated, or of *assumpsit* for money had and received. It relates instead to the correctness of permitting relief under a co-ordinate branch of equity jurisdiction. For although the partnership was practically dissolved on December 10th by the conclusion of the business, the fact that there had never been any settlement of the partnership affairs, and never any balance agreed upon between the partners, is conclusive of plaintiff's right to proceed in equity.

The question before us may be stated as follows: Suit being brought for an equitable estate in realty, claimed to arise as a constructive or resulting trust through part-

nership transactions, and this kind of relief being denied, may a court of equity retain the cause and proceed to an accounting and settlement of the partnership affairs, the same being confined to such transactions? We unhesitatingly answer, yes; provided the evidence indicates a necessity for such accounting, and the pleadings are consistent therewith.

It is unnecessary to discuss in detail the pleadings in the case at bar; in our judgment they contain enough to sustain this kind of relief. There is in the complaint no specific prayer for an accounting. As to whether the prayer for relief required by section 54 of the Civil Code is in any way binding upon the pleader so as to control or limit his recovery in contested cases, section 150 of the same instrument seems decisive.

This statute reads as follows: "The relief granted to the plaintiff, if there be no answer, shall not exceed that demanded in his complaint; but in any other case the court may grant him any relief consistent with the case made by the complaint and embraced within the issue."

The office of the prayer for relief required by section 54 aforesaid would seem to be that of indicating the relief allowable where no answer is filed; in contested cases the prayer is a matter of no significance. Upon this subject Dr. Bliss uses the following language: "If the facts put in issue and established by the evidence entitle the party to any relief in the power of the court to give, although not that demanded, it is the duty of the court to give it, and its power to do so is not conditioned upon the form of the prayer." Bliss on Code Pleadings, sec. 161. We indorse this exposition of the statute.

The complaint in this case contains the prayer for general relief characteristic of bills in equity where the code system of procedure has never received legislative sanction. And courts have sometimes, in granting relief different from that demanded, based their authority upon such prayer. Bliss, sec. 161, *supra*. But we prefer to

rest our action upon the clear import of the code section referred to.

The complaint mentions a certain other mining location known as the Western Belle; nothing has been said about this claim in the foregoing discussion, and no specific consideration thereof is necessary. Our conclusions concerning the Belle of the West are decisive of plaintiff's rights as to the Western Belle.

The decree will be reversed and the cause remanded, with directions that the district court proceed to an accounting between the partners and a settlement of the partnership affairs; and that upon the termination of such proceeding it enter the proper judgment or decree, consistent with the views herein expressed.

The costs of this appeal will be equally divided between the parties.

*Reversed.*