## CALDWELL V. DAVIS.

1. The relation existing between partners is one of trust and confidence. When dealing with each other in relation to partnership matters they are required to make full disclosure of all material facts within their knowledge in any way relating to the partnership affairs.

2. To entitle a party to the protection accorded to privileged communications, the communications must have been made to the counsel, solicitor or attorney acting, for the time being, in the character of a legal adviser, and must be made by the client for the purpose of professional advice or aid upon the subject of his rights and liabilities.

*Appeal from District Court, Dolores County.*

APPELLANT in his complaint alleged a copartnership between himself and defendant, formed for the purpose of buying and selling an option of the Bullion, Hidden Treasure and Cleveland mining claims; that on the 19th day of April, 1880, H. S. Rutan, Stillman P. Norton and Ebert Norton, the owners of said mining claims, made to E. L. Davis and H. J. Caldwell, appellee and appellant herein, a bond conditioned to convey said claims to said Davis and Caldwell, upon payment by them of the sum of $7,500 on or before July 22, 1880, in consideration of the sum of $500 paid by said Davis and Caldwell; that plaintiff went east and expended a large sum of money, to wit, the sum of more than $700, in endeavoring to sell said claims; that during plaintiff's absence from this state endeavoring to make such sale, the defendant negotiated a sale of an undivided one-half of said mining claims to Jacob Ohlwiler for the sum of $8,000, and that said agreement of sale was afterwards carried out; that, upon the return of plaintiff to this state, and on the 12th day of July, 1880, the defendant, with intent to defraud the plaintiff, fraudulently suppressed and concealed from plaintiff that he had made said agreement with Ohlwiler, and kept plaintiff in total ignorance thereof, and said nothing to plaintiff about his having sought or found a purchaser for said claims, and represented to plaintiff that he had not succeeded in finding a purchaser, and that he desired to purchase said mining claims for himself; that plaintiff, relying wholly upon the good faith, honor and integrity of the defendant, and in total ignorance of said sale to Ohlwiler, assigned all his interest in

said bond and property to the defendant for the sum of $500 and a horse of the value of $100; that, at the time said assignment was made, there was no accounting or settlements between plaintiff and defendant as to their said partnership affairs, and that there never has been such an accounting or settlement; that, on the 13th day of July, 1880, the said owners of said mining claims made, executed and delivered to defendant, and to said Jacob Ohlwiler, deeds to the whole of said mining claims, share and share alike; that said Ohlwiler paid all of the consideration therefor, being the full sum of $8,000, and that defendant paid no consideration therefor, but that he obtained an undivided one-half interest in and to each of said claims, and the sum of $500, on account of and by means of said option or title bond on said mining claims; that said undivided one-half of said mining claims and said $500 are gains and profits legitimately accruing to said copartnership; and plaintiff asks that an accounting may be had between plaintiff and defendant as to all partnership transactions regarding said option and mining claims, and offers to pay to defendant any sum that may be found due from the plaintiff to defendant, but charges the fact to be that defendant will be found to be a debtor to the plaintiff on such accounting; that suspicion of the fraud was first raised in the plaintiff's mind in the summer of 1882, but that the facts were not discovered until the fall of 1882, and that this suit was instituted as soon after such discovery as the nature of the case would admit. Prayed the judgment of the court that said assignment from plaintiff to defendant be declared fraudulent and void; that an account be taken of all copartnership dealings and transactions; that said partnership be dissolved; and that defendant be adjudged to convey by deed to the plaintiff an undivided one-quarter interest in and to each of said mining claims.

Defendant, in his answer, denies the copartnership; denies that, during the absence of the plaintiff from this

state, defendant succeeded in finding a purchaser for any portion of said claims, or made with Ohlwiler any agreement as to a sale of said claims or any interest therein; denies any intent to defraud plaintiff, or that he fraudulently suppressed or concealed the fact of having made any agreement for the sale of said claims or any interest therein; denies that he induced the plaintiff, by any fraudulent concealments or false representations, to make the assignment to him; alleges that, by agreement between plaintiff and defendant, the duty of selling said claims devolved solely on the plaintiff; alleges, upon information and belief, that plaintiff acquired full and complete knowledge of all circumstances surrounding and affecting the acquirement by said Ohlwiler of an interest in said claims.

Replication of plaintiff denies that the duty of selling said mining claims, or any part thereof, devolved solely upon the plaintiff; denies that in the month of July, 1880, he had knowledge of the circumstances of the sale to Ohlwiler, and avers that he did not and could not obtain such knowledge until eighteen months after such date.

Trial to the court and judgment for defendant, from which plaintiff appealed.

The evidence shows that Davis and Caldwell entered into an agreement to get a bond on the Bullion, Hidden Treasure and Cleveland lode mining claims for the purpose of selling the option so acquired at a profit; that they obtained such bond on the 19th day of April, 1880, by which bond the owners of said claims, in consideration of the sum of $500 to them in hand paid by Davis and Caldwell, agreed to convey to E. L. Davis and H. J. Caldwell said claims upon the payment of the sum of $7,500 on or before July 22, 1880; that Davis and Caldwell each paid one-half of said sum of $500; that Caldwell went east to sell said option immediately after said bond was secured, and returned to this state on the 11th day of

July, 1880, without having made a sale; that before Caldwell returned from the east, and some time in the fore part of June, he wrote to Davis that he had failed to make a sale and that he did not feel disposed to put the amount of the bonded price of the properties into them; that Davis, upon the receipt of this letter, commenced negotiations with Jacob Ohlwiler for a sale to him of an interest in the bonded property.

The following testimony of Jacob Ohlwiler clearly shows the nature of the transaction between Davis and Ohlwiler: " *Question.* When did you become interested in these claims? *Answer.* In 1880. *Q.* About what time? *A.* July 13. *Q.* How did you come to get interested, and how did you get interested in these claims? *A.* By purchase. *Q.* From whom? *A.* From E. L. Davis,— from the owners through E. L. Davis. *Q.* How were you induced — how did you come — to buy them or obtain an interest in them? *A.* By proposition from E. L. Davis. *Q.* When was that proposition first made to you? *A.* I couldn't tell the date, but I think some time in June,— the latter part of June. *Q.* What was the proposition that you should pay for the half? how much did he propose that you should pay for half? *A.* $8,000. *Q.* Did he explain to you, or did you have any conversation with him, in regard to the condition in which the title to the property stood? *A.* Yes, sir; Caldwell and he (Davis) had a bond on it. *Q.* Did he state how much of a bond? *A.* No. *Q.* Did he state the bonded price? *A.* No, sir. *Q.* Did you know what the bonded price was? *A.* Not at that time. *Q.* State, Mr. Ohlwiler, what the substance of the conversation was you had at this time at Columbus or Telluride with Mr. Davis with reference to these mines,— these lodes. State the substance of the conversation you had. *A.* Well, I recollect he stated that he (Mr. Davis) and Mr. Caldwell had a bond on the mine, and if Mr. Caldwell did not make a sale they were for sale, and that I could buy a

half interest or more.  That was about all that was said at that meeting; that was the substance.  *Q.* How long after this conversation with Mr. Davis at Columbia — how long a period elapsed — before you made any preparation to purchase a half interest in this property?  *A.* I don't fully recall the time.  It was after some several weeks, though I don't know how many, — until several weeks after I talked with Davis upon the subject. *Q.* In the meantime, between the conversation at Columbia and the next conversation you had with Davis, you entered into a correspondence with another person with regard to this one-half interest?  *A.* Yes, sir.  *Q.* When did you next have a conversation with Davis with reference to this property?  *A.* I stated, several weeks hence.  *Q.* Where was it?  *A.* At Ouray, I think.  *Q.* Can you remember about the date, or near the date? *A.* I don't think I can.  *Q.* Do you remember how long previous to your buying an interest in the property it was?  *A.* No; I can't fix the date.  *Q.* Well, then, days, weeks or months?  *A.* It may have been two weeks before I made the purchase.  *Q.* And what was the substance of this conversation?  *A.* That I was to correspond with my friends in regard to it, and see whether I could raise the means to meet the payment.  *Q.* Did you have any conversation with Davis at Ouray concerning the condition in which the property was, in which the title of the property stood, and how you were to receive one-half interest in the property for the $8,000?  *A.* I understood that Mr. Caldwell could not sell the property, and that I would look for a straight title from him, or I didn't want the property.  *Q.* From whom?  *A.* From Davis or any other person, — a straight title for half of the interest.  *Q.* Did you have any conversation with Davis in regard to the manner in which you were to receive this straight title to one-half interest, — how Davis was to arrange the matter so as to give you a straight title?  *A.* I think that was in the presence of Mr. Letcher.

*Q.* Will you state to the court what was the conversation? *A.* I think Mr. Letcher stated there was — [Defendants counsel objected to the witness giving Mr. Letcher's statements]. *Q.* Was Mr. Davis present? *A.* Mr. Davis was present. [And thereupon the court overruled the objection, and the witness answered.] *A.* That title may be had, that Mr. Letcher said the title may be had, through making purchase of Mr. Davis, or making purchase of Mr. Caldwell, or they sell a joint interest to me, or that the bond lapses the time, and then get it that way. I told them it didn't make any difference to me so I got a straight title. I don't care how they done it; how it was done. *Q.* While you were at Ouray, what understanding, if any, did you have with Davis as to your purchase of this property? *A.* That, if I could raise the money, I would take the property, if he could give me a good deed and title. *Q.* What understanding did you have with Davis as to what you should do with reference to raising the money? *A.* I was to go on to Lake City and telegraph to my friend for funds to pay this $8,000. *Q.* Was there any understanding with reference to any correspondence? *A.* There may have been before that, — before I went to telegraph. *Q.* There may have been? Are you not certain whether there was or not? *A.* I think there was. *Q.* When did you buy one-half of this property, and how did you come to buy it? *A.* On the 13th day of July, 1880, by paying $8,000, and receiving a deed from Nortons and Rutan. *Q.* How did you pay this $8,000, and to whom? *A.* To Rutan and Nortons, two brothers, and Mr. Davis. *Q.* How much did you pay Mr. Davis? *A.* I think it was $500. *Q.* On the 12th or 13th did you have any conversation with Mr. Davis in regard to this property? *A.* I think it was on the morning of the 13th I told him I was ready to buy the property. *Q.* What did he state? *A.* He said he was ready to sell it, — ready to give deed. *Q.* What did he state with reference to being able to give deed at that

time,— to give you a straight title to the property on the 13th? *A.* That he had purchased Caldwell's interest in the bond, and the transfer would be made direct from the parties owning the property. *Q.* At what price was the whole property bought from the owners? *A.* $8,000. *Q.* How much of the $8,000 did the owners receive from you? *A.* $7,500. *Q. Is it not a fact that, previous to your going to Lake City, you had an understanding — there was an understanding had between yourself and E. L. Davis — that if Mr. Davis could succeed in buying the interest of Mr. Caldwell in this bond that you were to buy one-half of this property for $8,000? A. I think there was.*"

Upon cross-examination this witness was asked the following question: "*Q. I will ask you if Davis on his part, in communications with you prior to going to Lake City, did not state it as a condition that he should first become the sole owner of the bond; that he should buy the Caldwell interest on his part? A. I think there was such a conversation on his part.*"

It is also shown by the evidence that Caldwell returned from the east on the 11th day of July, and on the 12th day of July assigned his interest in the bond to Davis for $500 and a horse worth $100; that Davis did not inform Caldwell, and Caldwell did not know, of the negotiations had between Davis and Ohlwiler, and that the assignment of Caldwell's interest in the bond was made by him in total ignorance of such negotiations. The allegation in defendant's answer, that the duty of selling said mining claims devolved solely on the plaintiff, is not established by the evidence.

Mr. T. J. O'DONNELL, for appellant.

Mr. J. F. VAILE, for appellee.

RISING, C. The numerous assignments of error will not be separately discussed; but, under a general consid-

eration of the case, the rulings of the court below, upon which the errors are assigned, will be passed upon.

The first and most important question for consideration is that of the sufficiency of the evidence to entitle the appellant to the relief demanded. Appellant bases his right of relief upon the conduct of the appellee; and how far the conduct of the appellee affects such right must be determined by the relations of the parties to each other. The plaintiff alleges that they were copartners for the purpose of buying and selling an option on certain mining claims. Under the decision in *Kayser v. Maugham,* 8 Colo. 232, the evidence in this case fully establishes the allegation. The relation existing between partners is one of trust and confidence. Pom. Eq. 963. Partners, when dealing with each other in relation to partnership matters, are required to make full disclosure of all material facts within their knowledge, in any way relating to the partnership affairs. A community of interest exists between the partners, and a community of interest produces a community of duty. This community of interest, by the terms of the bond and the agreement of the parties, was to continue until the 22d day of July. The bond having been obtained for the purpose of selling the option so acquired at a profit, for the joint benefit of appellant and appellee, a joint duty and obligation rested upon each, during the full time the bond had to run, to work for the accomplishment of such purpose. We think the evidence clearly shows that appellee did not perform this duty; that, prior to appellant's return from the east, appellee had negotiated a sale to Ohlwiler of one-half interest in the property for his own exclusive benefit; that he deliberately planned to obtain appellant's interest in the bond to enable him to carry out his negotiations with Ohlwiler; that he intentionally concealed from appellant all knowledge of his negotiations with Ohlwiler, and he led appellant to believe that he wanted appellant's interest in the bond for the sole purpose of

enabling him to put up the money and take the property.

In Story, Eq. § 329a, it is said: " When the contract is between those who sustain, or have lately sustained, any intimate and confidential relation, the law presumes the existence of that superiority and influence on the one part, and that confidence and dependence on the other, which is the natural result of the relation, and will accordingly decree the cancellation of the contract, unless it appear affirmatively to have been equal and just." In the making of this contract the parties were not on equal footing. Davis had knowledge of facts relating to the sale of the property which Caldwell did not have, and which knowledge equity and fair dealing required of him to disclose to Caldwell, because such knowledge was obtained under circumstances which made it the common property of himself and Caldwell. The concealment of, or the failure to disclose, these facts to Caldwell made Davis guilty of an actual fraud. Pom. Eq. Jur. § 901; Story, Eq. Jur. § 308; *Dambmann v. Schulting*, 75 N. Y. 55, 61.

The contract between Davis and Caldwell was unequal in that it enabled Davis to obtain all the benefits under their joint undertaking, and unjust in that such benefits were so obtained by reason of the suppression by Davis of facts which it was his duty to disclose.

In *Fitzsimmons v. Joslin*, 21 Vt. 129, 138, Redfield, J., in commenting upon conduct of this nature says: " Can it be said, then, that when one party acts under a misconception of the facts most material to the contract, which are known to the other party and studiously kept back, knowing that the other side is acting under this delusion, can it be said that such contract is binding at the bar of conscience, or, indeed, in moral or legal justice? I trust not."

In making the sale to Davis Caldwell was acting under misconception of most material facts. He was led to be-

lieve that a joint sale for the joint benefit of himself and Davis could not be made at a time when the only impediment in the way of a complete sale for the joint benefit of the parties was the desire and intention of Davis to obtain the full benefits of such sale for himself alone. Davis was under a legal as well as a moral duty and obligation to place Caldwell in possession of all information he had obtained relating to the sale or probable sale of the bonded property, during the existence of the copartnership, before he attempted to contract with Caldwell for his interest; and because of his failure to perform this duty and obligation the contract should be canceled.

The evidence fails to disclose such laches on the part of plaintiff in the bringing of his suit as will defeat his right to relief.

The question of tender is met by the allegations of the complaint that plaintiff offers to pay to the defendant, his copartner, what, if anything, should be found due from plaintiff to defendant upon an accounting and settlement of the partnership affairs, and demanding that such accounting be had, and charging the fact to be that the defendant will be found to be his debtor on such accounting. If in fact the defendant is indebted to the plaintiff in a sum equal to the amount defendant paid for the assignment of plaintiff's interest, we see no reason why the court of equity should require a further tender to be made. *Watts v. White*, 13 Cal. 321.

The question of laches by the plaintiff in bringing his suit was made an issue by the pleadings, and the seventh, eighth, ninth and tenth assignments of error are based upon the rulings of the court in the rejection of the testimony offered by the plaintiff upon this issue. There was no exception to the ruling of the court upon which the eighth assignment is based. In view of our conclusions upon another branch of the case, it is not necessary to discuss these assignments. The question of laches must be determined upon the knowledge of the plaintiff,

and his diligence in obtaining knowledge of the facts upon which his right to relief rests. There was no such laches on his part as will defeat his right to relief.

The errors assigned upon the ruling of the court in rejecting testimony of the witness Letcher may all be considered together; the objection to each of the questions being based upon the proposition that the matter inquired about consisted of privileged communications by Davis, as client, to Letcher as his attorney. It appears from the evidence that Davis went to Letcher between the 7th and 10th days of July, 1880, with one of the Nortons and Mr. Rutan, at which time Letcher drew a release of warranty from Davis to the Nortons and Rutan, or to one of them, and that afterwards he drew a deed, and examined the title to the bonded property. Letcher further says that he presumes the deed he drew was the result of conversa- tion had between Davis, Ohlwiler, Rutan and the Nortons at his office. To entitle a party to the protection accorded to privileged communications, the communications must have been made to the counsel, attorney or solicitor acting, for the time being, in the character of legal adviser, and must be made by the client for the purpose of professional advice or aid upon the subject of his rights and liabilities. 1 Greenl. Ev. §§ 239, 240. The evidence does not show that any communications had been made by Davis to Letcher, as his legal adviser, upon the subject of his rights and liabilities. The only employment of Letcher by Davis was to draw the release and deed. In drawing these instruments Letcher acted as a scrivener merely, bringing this case directly within the ruling in *Machette v. Wanless*, 2 Colo. 169, 179. In this case, as in *Machette v. Wanless*, the evidence does not show that Letcher was an attorney.

The witness was questioned as to the conversation between Davis and other persons in his presence, concerning matters not relating to his employment, and which were not communications made to him, and as to which

no confidence was reposed in him.  The court erred in sustaining the objections made to the questions put to the witness Letcher, excepting the one upon which the fourteenth assignment is based.

The judgment should be reversed and the cause remanded in conformity with the views herein expressed.

We concur:  MACON, C.; STALLCUP, C.

PER CURIAM.  For the reasons assigned in the foregoing opinion the judgment of the district court is reversed and the cause remanded.

*Reversed.*