Robert A. SILVERBERG, Partner of E & A Associates, a Colorado General Partnership, and A. Tenenbaum & Company, Inc., Plaintiff–Appellee,

v.

Joseph F. COLANTUNO, the Estate of Robert W. Isham, and John P. Dikeou, Defendants and Third Party Plaintiffs–Appellants,

v.

First Denver Corporation; Robert A. Silverberg; Maurine M. Ruddy; Alan H. Marcove; Vincent J. Boryla; Donald W. Roth; Edward A. Robinson; HLG, Inc.; Goldeneye, Inc.; Joseph M. Tenenbaum; Donald M. Clarke; James M. Greenbaum; Ralph H. Grills, Jr.; Myron R. Emrich; Bennett Aisenberg; Vincent J. Boryla, as trustee for Employee Pension Plan of Eagle Trace, Inc.; Jack Robinson; Hank Robinson; and Richard Robinson, Third Party Defendants–Appellees.

No. 96CA1113.

Colorado Court of Appeals, Div. IV.

Aug. 20, 1998.

Rehearing Denied Nov. 5, 1998.

Certiorari Granted Oct. 18, 1999.

Wherry & Carlstead, LLC, Burton I. Wherry, Edward P. Carlstead, Mark A. Neider, Denver, Colorado, for Plaintiff–Appellee and Third Party Defendant–Appellee Robert A. Silverberg.

Aronowitz & Ford, LLP, Timothy C. Ford, Denver, Colorado, for Plaintiff–Appellee A. Tenenbaum & Company, Inc.

Joseph F. Colantuno, Denver, Colorado; Steve A. Miller, P.C., Steve A. Miller, Denver, Colorado for Defendant and Third Party Plaintiff–Appellant Joseph F. Colantuno; Robinson & Schuyler, P.C., Warren A. Robinson, Denver, Colorado for Defendant and Third Party Plaintiff–Appellant the Estate of Robert W. Isham; Lance P. Vanzant, Denver, Colorado, for Defendant and Third Party Plaintiff–Appellant John P. Dikeou.

Ballard Spahr Andrews & Ingersoll, Roger P. Thomasch, Leslie A. Eaton, Denver, Colorado, for Third Party Defendant–Appellee First Denver Corp.

Aronowitz & Ford, LLP, Timothy C. Ford, Denver, Colorado, for remaining Third Party Defendants–Appellees.

Opinion by Judge CASEBOLT.

The judgment at issue here represents the disposition after a bench trial of six consolidated actions arising from the operation of a financially troubled bank over the course of more than a decade. The six actions included claims concerning unpaid capital assessments and calls; requests for accountings; allegations of breach of fiduciary duty, fraudulent misrepresentation and transfer; and claims upon personal guarantees and for personal liability on a promissory note. The trial court entered judgment for plaintiffs, Robert A. Silverberg and A. Tenenbaum & Company, Inc., (Tenenbaum) and third-party defendants, First Denver Corporation; Robert A. Silverberg; Maurine N. Ruddy; Alan H. Marcove; Vincent J. Boryla; Donald W. Roth; Edward A. Robinson; HLG, Inc.; Goldeneye, Inc.; Joseph M. Tenenbaum; Donald M. Clarke; James M. Greenbaum; Ralph H. Grills, Jr.; Myron R. Emrich; Bennett Aisenberg; Vincent J. Boryla, as trustee for Employee Pension Plan of Eagle Trace, Inc.; Jack Robinson; Hank Robinson; and Richard Robinson. Defendants and third-party plaintiffs, Joseph A. Colantuno, the estate of Robert W. Isham, and John P. Dikeou, appeal that judgment, and we affirm.

First Denver Corporation (FDC), organized in 1981 by Silverberg, Colantuno, and Isham, borrowed $2.8 million to purchase the stock of a bank (stock loan). The loan was secured by FDC and bank stock, with personal guarantees by those three individuals.

E & A Associates (E & A), a partnership that was also formed in 1981 by those three individuals (among others), owned the building and underlying leasehold and leased them to the bank. Silverberg ultimately became the president of FDC, the managing partner of E & A, and a director of the bank.

Between 1981 and 1986, E & A borrowed $1.3 million from the International Order of Foresters (IOF) and $170,000 from Green Mountain Bank (GMB) to improve the building and property. Each lender was granted a first and second mortgage respectively to secure such loans. Both loans were personally guaranteed by the three individuals.

In 1985, in response to regulatory determination of inadequate capitalization, additional investors, including Dikeou, were obtained for E & A, and it became the direct owner of FDC and, thus, the bank. Dikeou signed a personal guaranty of the stock loan limited to 4% of the outstanding principal. A partnership agreement was ultimately signed by all partners.

In 1986, FDC needed additional funds. Silverberg personally borrowed $170,000 from the Bank of Winter Park and loaned that amount to FDC. Colantuno and Isham

guaranteed the loan from Silverberg to FDC in proportion to their partnership interest in E & A.

In 1987, because of the bank's poor financial condition, the Office of Comptroller of the Currency (OCC) issued a cease and desist order (C & D order) against the bank, preventing it from paying dividends to FDC and requiring it to use those funds to increase its capital. Such dividends had been the sole source of funds for FDC's interest payments on the stock loan and, without such proceeds, Silverberg had to commence assessments against the E & A partners. The C & D order remained in effect until 1993.

In 1989, the original stock loan that had been refinanced in 1985 through another bank was assigned to the Tenenbaum company, which was owned by a relative of Silverberg. Because it was considered to be a "problem" loan, the assignment was for a substantially discounted amount.

In October 1990, the OCC reduced the bank's equity capital from approximately $2.5 million to $350,000 by charging off bad loans. This either put or continued the bank in a "CAMEL 5" rating, which meant that the OCC believed the bank was at substantial risk of immediate or near term failure. It also depleted the bank's equity reserves to less than 1% of the bank's assets, substantially below the 7% required by the OCC.

From October 1990 through spring of 1991, Silverberg explored various options to secure additional capital. Other banks that were solicited to purchase the bank declined because the bank had no value. Present E & A partners were unwilling or unable to raise the necessary funds and the E & A partnership had a negative net worth.

During this same time, and after consultation with Colantuno and Isham, Silverberg caused E & A to cease making payments on the IOF and GMB loans, in order to precipitate negotiations for discounting them.

Because the OCC required an immediate capital injection to avoid takeover of the bank by the Federal Deposit Insurance Corporation (FDIC), Silverberg thereafter proposed that a group of investors (made up of current E & A partners, resigned partners and new people) would contribute $1 million to capitalize the bank and would acquire the building and real property leasehold, the bank business, including any equity position at the time, and the shares of FDC, all unencumbered (Go Forward plan). At this time, E & A would assume the Tenenbaum obligation, which had encumbered the FDC shares, and the Bank of Winter Park loan.

An appraisal of the leasehold and building property performed in June 1991 set the value at $1,050,000. However, a supplemental appraisal in December, required by the OCC and later accepted by it, set the value at $750,000.

Existing E & A partners were invited to participate in the Go Forward plan. As a condition, each would be first required to pay their pro-rata share of the Tenenbaum obligation and their share of the Bank of Winter Park loan. Ten of the existing partners, including Silverberg, elected to join. Colantuno, Isham, and Dikeou did not. The partnership was also requested to approve the Go Forward plan and eighty-two percent, including Isham, but not Colantuno or Dikeou, consented.

In July 1991, the Go Forward plan was finalized, subject to a condition subsequent that required approval by the Federal Reserve, since the transaction involved a change in ownership of the bank's holding company. That approval was finally obtained in August 1992.

I.

Contrary to defendants' contentions, we find evidentiary support for the trial court's rejection of their claim that Silverberg's accomplishment of the Go Forward plan breached fiduciary duties to the E & A partners who declined to participate. Hence, we will not disturb those findings. *See Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

■ Partners in a business enterprise owe fiduciary duties to one another that encompass the highest duty of loyalty. They stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing. Each

partner has the right to demand and expect from the other a full, fair, open, and honest disclosure of everything affecting the relationship. *Hooper v. Yoder*, 737 P.2d 852 (Colo.1987).

■ The fiduciary duty owed by a general partner includes the duties of good faith, sound business judgment, candor, forthrightness, and fairness. *Roeschlein v. Watkins*, 686 P.2d 1347 (Colo.App.1983).

■ A partner must make full disclosure of all material facts within his or her knowledge in any way relating to partnership affairs. *Hooper v. Yoder, supra; Caldwell v. Davis*, 10 Colo. 481, 15 P. 696 (Colo.1887). This duty requires that partners not misrepresent or intentionally conceal material facts, as well as make timely affirmative disclosure without prompting. *See Hansen v. Lederman*, 759 P.2d 810 (Colo.App.1988).

■ Whether a breach of a fiduciary duty has occurred is a question of fact and thus, here, was a matter for the trial court to resolve. *See Rupert v. Clayton Brokerage Co.*, 737 P.2d 1106 (Colo.1987); *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508 (Colo.1986).

■ The credibility of the witnesses, the sufficiency, probative effect, and weight of the evidence, including documentary evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the trial court, and its treatment thereof will not be disturbed on review unless clearly erroneous. *Cottonwood Hill, Inc. v. Ansay*, 709 P.2d 62 (Colo.App.1985).

■ On appellate review of the trial court's findings, we must view the record in the light most favorable to the judgment, the presumption being that the trial court is correct. *Morgan v. Wright*, 156 Colo. 411, 399 P.2d 788 (1965).

■ Here, the trial court found no breach of a fiduciary duty by Silverberg, and in each alleged instance, we find evidentiary support for the trial court's findings.

Specifically, there is evidentiary support for the court's findings that:

• In light of economic conditions, the impaired financial condition of the bank, and the regulatory pressure, plus the appraised building and leasehold value of $750,000, the Go Forward plan was fair and constituted a reasonable business decision by Silverberg in a good faith effort to protect partnership assets.

• The reduction in bank rental payments to E & A instituted by Silverberg in 1990 was appropriate in light of regulatory requirements for recapitalization.

• Silverberg did not act in excess of his authority under the partnership agreement in reducing the rental payments because such act was not a release of a debt already due to the partnership, but rather was the modification of an obligation not yet due.

• Silverberg fully disclosed information concerning the bank's precarious financial condition and the actions needed to rectify the situation, thereby meeting his fiduciary disclosure obligation as to the Go Forward plan.

• At the time of the Go Forward plan, the bank had no value.

• An FDIC takeover of the bank would have been more damaging to E & A and its partners than was the Go Forward plan.

• Silverberg's decision in early 1991 to withhold further payments on the IOF and GMB loans was a result of sound business judgment, and even if his efforts to use that withholding to obtain more favorable terms on the loans could have been more successful, such good faith error does not constitute a breach of his fiduciary duty.

II.

We also reject defendants' other contentions regarding breach of fiduciary duty.

Defendants contend that in assessing Silverberg's actions, the trial court erroneously lowered the standard of care applicable to fiduciaries. Suffice it to say that the record discloses that the trial court applied the standard established by our case law.

The record belies defendant's next contention that the trial court employed only the

test of "reasonable business judgment" in ascertaining the propriety of Silverberg's actions. To the contrary, the court used a variety of different inquiries, including whether Silverberg acted in good faith, engaged in self-dealing, fully disclosed, and remained loyal.

Nor did the trial court erroneously impose on defendants the burden of proof regarding breach of fiduciary duty. Defendants cite several Illinois cases for the proposition that, when there is a question concerning breach of fiduciary duty by a managing partner, that partner carries the burden of proving his or her innocence. *See, e.g., Cronin v. McCarthy,* 264 Ill.App.3d 514, 202 Ill.Dec. 129, 637 N.E.2d 668 (1994). However, such is not the rule in Colorado. *See Western Distributing Co. v. Diodosio,* 841 P.2d 1053 (Colo.1992).

Defendants also cite two instances in which they allege that, because Silverberg owed conflicting fiduciary duties originating from the different capacities in which he served, there were *per se* breaches of his fiduciary duty to the partners of E & A. However, findings of the trial court, having support in the record, demonstrate that these incidents do not require reversal.

First, as to the so-called "Goldeneye" transaction, Silverberg conceded that he had made an improper assessment of the partners and had agreed to pay the money from such assessment into the partnership in an accounting.

As to the situation concerning the "AFTC" transaction, the trial court found a potential conflict, but also found E & A benefited from the transaction. Thus, the trial court found no injury.

### III.

■ Defendants next maintain that Silverberg did not have the authority to implement the Go Forward plan and that the trial court erred in finding to the contrary. We disagree.

Defendants note that one step in the Go Forward plan called for the transfer of all of the assets of E & A to another entity. Thus, they argue that Silverberg could not effect that transfer by virtue of the statutory prohi-

bition in § 7–60–109(3)(c), C.R.S.1997, against a partner taking an action that would make it impossible to carry on the business of the partnership.

However, § 7–60–109(3)(c) contains an exception to the stated prohibition if the action is authorized by the partnership. And, here, the partnership agreement permits the conveyance of partnership assets if such is authorized by "written consent of 75% of interest of the Partners...." The trial court found that 82% of the partnership interests had consented to the Go Forward plan, and thus, Silverberg had the requisite authorization. *See Mist Properties, Inc. v. Fitzsimmons Realty Co.,* 228 N.Y.S.2d 406 (N.Y.Sup. Ct.1962) (when a partnership agreement specifically contemplates and provides for a transfer of partnership assets without the unanimous consent of the partners, such a transfer does not violate a statute that would ordinarily require unanimous consent in the absence of such language); *cf. Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057 (2d Cir.1977)(unanimous consent of partners required where partnership agreement contained no language providing for a lesser authorization).

■ Defendants, nevertheless, contend that the trial court erred in concluding that 82% of the partnership interests had consented to the Go Forward plan. Specifically, they argue that, in making its calculation, the court should have included the interests of the partners who had withdrawn from the partnership after payment of their pro-rata share of the Tenenbaum note. We disagree.

■ A partnership may continue to operate with its remaining partners after a partner has withdrawn. *Tafoya v. Perkins,* 932 P.2d 836 (Colo.App.1996). That is what occurred here, and thus, we perceive no error in the court's calculation concerning consenting partnership interests.

### IV.

■ Defendants' next contention is that E & A's transfer of assets in the Go Forward plan was a fraudulent transfer under § 38–8–101, C.R.S.1997, because in effecting that

transfer Silverberg intended to hinder, delay, or defraud creditors. We perceive no error in the trial court's rejection of this contention.

The disposition of this contention is contingent on a finding as to Silverberg's intent, and since that is a question of fact, *see Harvey v. Harvey*, 841 P.2d 375 (Colo.App. 1992), the issue again becomes whether there is evidentiary support for the trial court's findings.

Here, in concluding that the transfer of the bank property and leasehold interest, together with the FDC stock, was not performed with actual intent to hinder, delay, or defraud any creditor of E & A, the trial court relied upon its findings relating to the Go Forward plan and the breach of fiduciary duty claims, and restated its ultimate findings that the Go Forward plan was entered into in good faith and was a reasonable business decision to protect E & A assets by avoiding the probable dire adverse consequences of a takeover of the bank by the FDIC.

There is adequate record support for the trial court's findings and conclusions. We note first that Isham approved and authorized the Go Forward transaction in writing after full disclosure. In addition, this plan was specifically described and fully disclosed to the partners of E & A, including Colantuno, who admitted that he did not advise Silverberg of any objection to the transfers.

■■■ We reject defendants' contention that the trial court should have made separate findings concerning the eleven "badges of fraud" set forth in § 38-8-105(2), C.R.S. 1997. The court's findings incorporate its extensive analysis of the breach of fiduciary duty claims and the legitimate and good faith purposes behind the Go Forward plan. The findings and the record make it clear that the trial court was aware of and considered many, if not all, of these pertinent factors. Separate findings on each factor are not required. *See In re Marriage of Sharp*, 823 P.2d 1387 (Colo.App.1991)(specific findings are not required so long as the basis for the trial court's decision is apparent from its findings).

As an alternative argument for finding the Go Forward plan constituted a fraudulent transfer, defendants assert that it fell within the ambit of § 38-8-105(1)(b), C.R.S.1997, in that E & A did not receive "reasonably equivalent value" for the transfer of its assets.

■■■ "Reasonable equivalence" is not wholly synonymous with market value, even though market value is an important factor to be used in the assessment. *See In re Morris Communications NC, Inc.*, 914 F.2d 458 (4th Cir.1990). Reasonable equivalence depends upon an analysis of all the facts and circumstances of each case. *See, e.g., In re General Indus.*, 79 B.R. 124 (Bankr.D.Mass. 1987) ("reasonably equivalent value" implies rule of reasonableness in light of particular circumstances of case); *In re Adwar*, 55 B.R. 111 (Bankr.E.D.N.Y.1985) (question of value should be determined on case by case basis).

This argument thus hinges on whether there is supporting evidence for the trial court's factual determination of reasonable equivalence. As before, we find such support in the record. *See WCM Industries, Inc. v. Trustees of Wilson 1985 Revocable Trust*, 948 P.2d 36 (Colo.App.1997)(reasonable value finding will not be disturbed unless clearly erroneous or without evidentiary support).

■■■ As to the assets transferred by E & A, given the imminent probable takeover of the bank by the FDIC, the likelihood of a thorough investigation of possible insider transactions and possible insider liabilities, the C & D order, the bank's lack of equity capital and reserves, the "CAMEL" rating of 5, the OCC requirement of an immediate capital infusion, the bank auditor's refusal to provide a "going concern" opinion, and the refusal of other banks to consider a purchase because of their conclusion that the bank had no value, we perceive no error in the trial court assigning the bank stock a zero value. Nor do we find any error in the court choosing to assign the building and leasehold a value of $750,000 consistent with the most recent appraisal.

In the Go Forward transaction, E & A received, in effect, $872,000 in cash as well as additional debt relief of $328,000 owed on the

IOF and GMB loans. It transferred the building and leasehold and assumed $400,000 on the Tenenbaum note and the Bank of Winter Park obligation.

In summary, given the totality of the circumstances, we find evidentiary support for the trial court's finding. *See In re Fairchild Aircraft Corp.,* 6 F.3d 1119 (5th Cir.1993)(dollar for dollar equivalent not required); *Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992) (indirect benefits may be evaluated in determining reasonably equivalent value).

V.

The judgment entered by the trial court included an award to Tenenbaum on its note. Defendants challenge that award on a variety of bases. We find none persuasive.

Insofar as defendants contend that Tenenbaum cannot recover because of its participation in Silverberg's acts that were a breach of fiduciary duty, such contentions are necessarily vitiated by our holding that the trial court did not err in determining that Silverberg did not breach his fiduciary duties.

We also reject defendants' contention that the assumption is void because of a failure of consideration.

The assumption of an indebtedness is a matter of contract and, as such, all contractual essentials, such as valid consideration, must exist for the assumption agreement to be enforceable. *Bayou Land Co. v. Talley,* 924 P.2d 136 (Colo.1996).

Here, E & A received a benefit from its assumption of the Tenenbaum obligation, inasmuch as the assumption was part of the entire Go Forward plan.

Defendants next argue that, by a letter they sent, they were tendering fulfillment of their obligations as debtors on the note and that, contrary to the good faith requirement of § 4–1–203, C.R.S.1997, Tenenbaum did not permit redemption of the collateral, *i.e.,* the FDC stock, as is authorized by § 4–9–506, C.R.S.1997. However,

the letter in question asks only that Tenenbaum provide information on the "outstanding balance" of the note and to advise of "your willingness" to assign the note without recourse to a potential lender of the defendants. As such, the letter did not represent an actual, unconditional, physical production of payment, and thus, cannot form a basis for denying recovery. *See Task Enterprises, Inc. v. Pratt Adjustment Co.,* 695 P.2d 762 (Colo.App.1984).

Again invoking provisions of the Uniform Commercial Code (UCC), defendants additionally contend that, because Tenenbaum disposed of the collateral in a commercially unreasonable manner, the holding in *Cooper Investments v. Conger,* 775 P.2d 76 (Colo. App.1989) is controlling and dictates that Tenenbaum may not recover.

As described in *May v. Women's Bank,* 807 P.2d 1145 (Colo.1991), a secured creditor is obligated to follow certain procedures for the disposition of collateral after a debtor's default. Here, there are conflicting claims by the parties whether these procedures were followed. However, in our view, the key issue is whether there was a "disposition" of the collateral within the meaning of the statute. Because we conclude that there was not, we perceive no barrier to Tenenbaum's recovery.

Section 4–9–504, C.R.S.1997, provides that a secured party, after default, "may sell, lease or otherwise dispose of any or all of the collateral ... The proceeds of the disposition shall be applied [as follows]...."

The term "disposition" is not defined in the UCC. The term "proceeds" is defined in § 4–9–306(1), C.R.S.1997, as "whatever is received upon the sale, exchange, collection, or other disposition of the collateral."

For several reasons, we conclude that Tenenbaum did not "dispose" of the collateral within the meaning of the statute. First, "disposition" of the collateral connotes receipt of "proceeds." Here, Tenenbaum received no proceeds. Rather, it released the collateral to the debtor. *See Central Virginia Bank v. Bell,* 9 UCC Rep. Serv.2d 422, 1989 WL 418682 (Va. Cir. Ct.1989)(the return of security to the debtor fails to constitute a

"disposition" within the meaning of the UCC because the return of security does not provide proceeds).

We are not aware of any authority indicating that a "disposition" includes a release of collateral to its owner. *See generally* R. Anderson, *Uniform Commercial Code* §§ 9–504:45, 9–504:46, & 9–504:47 (1994). Instead, the contrary appears to be true. *See Citizens State Bank v. Davison,* 895 S.W.2d 138 (Mo.App.1995) (the release by the creditor of its claim against assets held by the bankruptcy trustee of the debtor does not constitute a "disposition" by the creditor).

Second, an examination of the default provisions of article 9 of the UCC leads us to conclude that "disposition" upon default was intended to refer to a transfer of some portion of the *creditor's* interest in the collateral *and* a transfer of the *debtor's* interest. *See* § 4–9–504 (sale or lease); § 4–9–506, C.R.S. 1997 (debtor's right to redeem its interest in the collateral); §§ 4–9–504(2) & 4–9–502, C.R.S.1997 (secured party must account to debtor for any surplus); § 4–9–504(4), C.R.S. 1997 (when collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein and discharges the security interest under which it is made). No transfer of the debtor's interest occurred here.

Third, application of the *ejusdem generis* principle of statutory construction supports the same result. The words "otherwise dispose" follow "sell" and "lease." The latter two terms contemplate a disposition terminating, altering, suspending, or transferring the rights of possession and ownership that both a debtor and secured party enjoy. Hence, a "disposition" must mean a similar transaction.

Fourth, a secured party is not required to dispose of collateral upon default. Because its remedies are cumulative, it can proceed under the UCC or pursue a judgment against the debtor under a promissory note or contract. Section 4–9–501, C.R.S.1997. To hold that a secured party's release of the collateral to the debtor triggers the rights and obligations under § 4–9–504 would be tantamount to requiring the secured party first to proceed against the collateral. The law does not require such action, *see Alamosa National Bank v. San Luis Valley Grain Growers, Inc.,* 756 P.2d 1022 (Colo.App.1988), especially when, as here, the secured party's action does not impair the debtor's position.

In summary, we conclude that the trial court did not err in allowing Tenenbaum to recover on its note.

## VI.

Defendants assert that, if E & A's assumption of the Tenenbaum loan was valid, then E & A and each of its then existing partners became liable for that debt and each of the partners is liable to the others for pro-rata contribution. Accordingly, they contend that Silverberg is liable to them for contribution.

We agree generally with the principle of law asserted. *See* §§ 7–60–115 & 4–3–116, C.R.S.1997; *Humphrey v. O'Connor,* 940 P.2d 1015 (Colo.App.1996). However, here, the trial court already had concluded that Silverberg was liable as a partner for the Tenenbaum debt. But, it also held that he should receive credit against the debt for $118,400 that he had paid on that loan in June 1991. Further, the record confirms that Silverberg paid $138,165 to Tenenbaum to obtain another partial satisfaction of the obligation owed to Tenenbaum. It thus appears that Silverberg's payments constituted his full pro-rata share of the Tenenbaum debt.

Defendants have not appealed that determination in this proceeding; hence, it is binding on review. Accordingly, we reject this contention.

## VII.

Tenenbaum sued Isham, Colantuno, and Dikeou on both the promissory note and their guarantees. The trial court concluded that the change of debtor from FDC to E & A was material and, because it was done without their consent, it released those individuals from liability under their guarantees. The trial court also found that the Go Forward plan was not detrimental to the part-

ners and was the result of "reasonable business judgment" by Silverberg.

Defendants assert that these determinations are inherently contradictory and must be reversed. Further, defendants claim that these inconsistent decisions usurped their rights of indemnity against FDC. We disagree.

These arguments ignore the fact that Colantuno, Isham, and Dikeou acted in several different capacities throughout the transaction. Before the E & A assumption, they were liable on the Tenenbaum loan only as guarantors, FDC being the primary obligor. The trial court's finding that the substitution of E & A was a material change that voided their liability as guarantors is not inconsistent with its finding that Silverberg did not breach any fiduciary duty to them. In fact, the substitution of debtors benefited them in this sense. Defendants' liability as partners did not arise until after E & A assumed the obligation.

Under the guarantees, the guarantors had the right of indemnity against FDC as the maker of the note. While it is true that the ability to seek indemnity against FDC was eliminated by the Go Forward plan because E & A assumed the obligation and FDC received a covenant not to execute from Tenenbaum, it was not unfair that the right of indemnity was also eliminated because that right arose only by virtue of the guarantees. Once the guarantees were voided by the change of debtors, defendants were released from their guaranty obligations and, thus, had no need for an indemnity claim in that capacity.

### VIII.

We also reject defendants' claim that the Go Forward plan materially altered their liability in contravention of their guarantees and the partnership agreement.

Dikeou's argument is premised upon several assertions: First, when he joined the partnership, he signed a several guaranty for 4% of the stock loan later assigned to Tenenbaum. Beyond this, he was liable to his partners under the partnership agreement only for proportionate assessments necessary for payment of interest on the stock loan.

Second, even though he was as a matter of law jointly and severally liable for payment of partnership obligations incurred after he became a partner, he knew that the partnership agreement specifically provided that he would not suffer any ultimate loss disproportionate to his partnership interest. But, when E & A assumed the Tenenbaum obligation, Dikeou argues, it constituted a fundamental alteration of his obligation under the partnership agreement, because he then became jointly and severally liable to Tenenbaum for the entire obligation. Colantuno and Isham present similar contentions.

As to the assertion that the assumption by E & A materially altered the guaranty agreements, the trial court agreed and defendants were released from that obligation as guarantors.

As to the contention that this assumption breached the partnership agreement, we disagree. Under the partnership agreement, all partners acknowledged their proportional personal guarantees of the Tenenbaum loan. Even though the loan was the obligation of FDC, the agreement also provided that "the partners, pro-rata in accordance with their Percentage Interest, shall [also] be responsible for Additional Capital Contributions to the extent required to meet interest payments on the Tenenbaum Loan, or its refinancing . . . ."

The partnership agreement also specified that, in order to obtain the loans needed to carry on the business, it might be necessary for the individual partners to sign loan agreements that provided for joint and several liability. In addition, the agreement specifically allowed the managing partner to incur debts of up to $500,000 without a 75% vote of the partners.

Under these circumstances, the assumption of the Tenenbaum obligation did not constitute a breach of the partnership agreement.

### IX.

We reject defendants' final contention that the trial court erred in allowing

Silverberg's expert witness, a lawyer, to testify, because his opinions constituted only inadmissible legal conclusions under CRE 703 & 704.

■ Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. CRE 704. However, an expert may not usurp the function of the court by determining the applicable law and communicating legal standards to the trier of fact. *People v. Lesslie*, 939 P.2d 443 (Colo.App.1996).

■ A trial court's determination concerning the admission of expert testimony is discretionary, and we will not reverse its ruling absent an abuse of that discretion. *See People in Interest of Martinez*, 841 P.2d 383 (Colo.App.1992).

Here, the trial court explicitly recognized that CRE 704 prohibited testimony involving legal conclusions. However, it concluded that the testimony could be of assistance by sorting out business transactions, directing the court to various documents, and analyzing the communications that had occurred among partners.

■ Considering the complex nature of the involved relationships and transactions, and further considering that trial judges sitting as factfinders are presumed to ignore incompetent and inadmissible evidence, *see Bosma v. Evans*, 96 Colo. 504, 44 P.2d 511 (1935), we find no abuse of discretion here.

The judgment is affirmed.

Judge ROTHENBERG and Judge ROY, concur.